STATE OF MICHIGAN

IN THE DISTRICT COURT FOR THE 68TH JUDICIAL DISTRICT

THE PEOPLE OF THE STATE OF MICHIGAN,

v                                          D.C.# 10-1667FYC
                                           C.C.# 11-028140-FC

PHILLIP CHARLES GIBBS,
                          Defendant.       JUDGE FULLERTON
_____/

THE PEOPLE OF THE STATE OF MICHIGAN,

                                           D.C.# 10-1668FYC
v                                          C.C.# 11-028141-FC

TYRELL HENDERSON,
                          Defendant.       JUDGE FULLERTON
_____/


PRELIMINARY EXAMINATION - VOLUME I

BEFORE THE HONORABLE TRACY COLLIER-NIX, DISTRICT JUDGE

Flint, Michigan - December 29, 2010

APPEARANCES:

For the People:            JENNIFER MCKELLAR P59603
                           Assistant Prosecuting Attorney
                           100 Courthouse
                           Flint, Michigan 48502
                           (810) 257-3232

For Defendant Gibbs:       JEFFREY SKINNER P31379
                           Attorney at Law
                           720 Church Street
                           Flint, Michigan  48502
                           (810) 232-3044


For Defendant Henderson:   LYNNE TAFT P40419
                           720 Church Street
                           Flint, Michigan 48502
                           (810) 767-2474



1

Recorded by:                    Marlene Ragland, CER-8336
                                Certified Electronic Recorder
                                (810) 766-8991

TABLE OF CONTENTS

WITNESSES:  PEOPLE                                                    PAGE

NANCY ANAGNOSTOPOULOS

    Direct Examination by Ms. McKellar                    7
    Cross-Examination by Mr. Skinner                     19


JEREMY KASSING

    Direct Examination by Ms. McKellar                   35
    Voir Dire by Ms. Taft                                41
    Cross-Examination by Ms. Taft                        47
    Cross-Examination by Mr. Skinner                     50


WITNESSES:  DEFENDANT

None

EXHIBITS:                                      IDENTIFIED  RECEIVED

None

1    Flint, Michigan

2    Wednesday, December 29, 2010, 2:32 p.m.

3    THE COURT:  All right, these are the matters of

4    the State of Michigan versus Phillip Charles Gibbs 10-

5    1667FYC and State of Michigan versus Tyrell Henderson 10-

6    1668FYC.  May I have appearances for the record, please?

7    MS. MCKELLAR:  Good afternoon your Honor,

8    Jennifer McKellar appearing on behalf of the People.

9    Seated at Counsel with me will be Sergeant Shawn Ellis.

10   MR. SKINNER:  Good afternoon your Honor, Jeff

11   Skinner, bar number 31379 appearing on behalf of Mr.

12   Phillip Gibbs, Mr. Gibbs is seated at Counsel table to my

13   right.

14   MS. TAFT:  Lynne Taft on behalf of Mr.

15   Henderson who is on my right.

16   THE COURT:  And this is the date and time for

17   preliminary examination.  Are the People ready to

18   proceed?

19   MS. MCKELLAR:  Yes, your Honor.

20   THE COURT:  Now there were a couple of things

21   that were to have been done since we last had this matter

22   before all of us on November 17th, and one of those things

23   was a corporeal line-up, has that been done?

24   MS. MCKELLAR:  Yes, your Honor.

25   MR. SKINNER:  It's been accomplished, thank

4

1    you.

2              THE COURT:  All right.  And then at that time

3    Ms. McKellar, you also indicated there were going to be

4    three witnesses, is that still the case?

5              MS. MCKELLAR:  Yes, your Honor.

6              THE COURT:  All right.  The situation is and

7    we'll just see how things flow, but this Court also has a

8    matter scheduled at three-thirty and another matter at

9    four-thirty.  It's now about two thirty-five, we will get

10   as much done as possible as we can today and if we can't

11   get everything done today, we will talk about a

12   continuation date.  Every effort will be made, however,

13   that if there is a witness testifying, we will not begin

14   Cross-Examination if we don't have enough time to

15   complete that and we'll just continue that witnesses'

16   subpoena, all right?  Are there any preliminary issues,

17   Ms. McKellar?

18             MS. MCKELLAR:  Your Honor, as far as witness

19   sequestration, that has been done by the Prosecution.

20             THE COURT:  All right, Mr. Skinner?

21             MR. SKINNER:  Nothing Judge.

22             THE COURT:  Ms. Taft?

23             MS. TAFT:  No, Judge.

24             THE COURT:  All right, let's proceed, call your

25   first witness please.

1      MS. MCKELLAR:  Thank you, your Honor.  The

2   People call Nancy and I will allow her to pronounce her

3   last name.

4      THE COURT:  All right, thank you.

5      MS. MCKELLAR:  Go up by the Judge and you're

6   going to have a seat right here, she's gonna swear you in

7   first, okay?

8      THE COURT:  Stand beside that chair initially

9   and raise your right hand.  Do you solemnly swear or

10  affirm that the testimony you give today will be the

11  truth and nothing but the truth, so help you God?

12     THE WITNESS:  Yes, I do.

13     THE COURT:  All right, if you will now be

14  seated in that chair, which is the witness chair, and you

15  will see that there is a microphone in front of you, it

16  is recording and because it's recording you cannot

17  respond uh-hum or uh-uh, you must say yes or no, you

18  understand?

19     THE WITNESS:  Yes ma'am.

20     THE COURT:  All right, thank you.

21     MS. MCKELLAR:  Good afternoon.

22     THE WITNESS:  Hello.

23          NANCY ANAGNOSTOPOULOS

24  (At 2:35 p.m, sworn as a witness, testified as

25  follows)

6

```
1                        DIRECT EXAMINATION

2    BY MS. MCKELLAR:

3    Q     Could you please state and spell your name for the

4          record?

5    A     Nancy Anagnostopoulos, N-a-n-c-y A-n-a-g-n-o-s-t-o-p-o-u-

6          l-o-s.

7    Q     Thank you.  I'd like to draw your attention to October

8          26th, 2010 and ask if you were in the City of Flint,

9          Genesee County, Michigan on that day?

10   A     Yes, I was.

11   Q     And where were you?

12   A     At 2412 Davison Road, Wholesale 4 U.

13   Q     And what is Wholesale 4 U?

14   A     It's a second hand store.

15   Q     And is that your place of employment?

16   A     It's my husband's.

17   Q     Approximately what time were you at the Wholesale 4 U

18         store?

19   A     I got there at about five-twenty.

20   Q     Is that in the p.m. hours?

21   A     Yes.

22   Q     And is that a business that your husband owns?

23   A     Yes.

24   Q     And when you went to Wholesale 4 U, who was present at

25         that business?
```

7

1    A    There was my husband, and one employee and two other

2         customers.

3    Q    What is the name of your husband?

4    A    Costas Anagnostopoulos.

5    Q    And is that spelled C-o-s-t-a-s?

6    A    Yes.

7    Q    And you testified there was one other employee there?

8    A    Yes.

9    Q    And what is the name of the other employee that was

10        there?

11   A    Jeremy Kassing.

12   Q    Is this a store that your husband owns?

13   A    Yes.

14   Q    Were you there to work or were you there visiting?

15   A    I had just gotten off work, and always come over there

16        until he closes up.

17   Q    You also testified that there were two other customers?

18   A    Yes.

19   Q    Were these two other customers in the store when you

20        arrived or did they come after you got there?

21   A    Those two customers were in the store when I arrived.

22   Q    Okay, and what happened when you arrived?

23   A    Those two customers left about a minute after I got

24        there.

25   Q    Okay.  And how long were you at the store before anyone

8

1       else came in?

2   A   Five minutes.

3   Q   And what happened after the two customers left and five

4       minutes passed?

5   A   Two young men came in and said that an Xbox game that was

6       purchased earlier in the day wasn't working.

7   Q   And is Xbox games, is that something that's sold at your

8       husband's store?

9   A   Yes.

10   Q   Now the two customers that came in with this Xbox game,

11       would you recognize them if you saw them again?

12   A   Yes.

13   Q   And do you see them today in the courtroom?

14   A   Yes, I do.

15   Q   Okay, and before I have you identify them, you testified

16       that they said this Xbox game isn't working; is that

17       correct?

18   A   Correct.

19   Q   Did one, in particular, have the Xbox game in their hand?

20   A   Yes.

21   Q   And who was that?

22   A   That was the gentleman in the orange.

23             MS. MCKELLAR: Your Honor, and you point--your

24       Honor, may the record reflect that this witness has

25       identified Mr. Henderson?

1      THE COURT:  Any objections?

2          MS. TAFT:  No objection, Judge.

3          THE COURT:  All right then the record will

4    reflect that this witness has identified the Defendant

5    Tyrell Henderson.

6  BY MS. MCKELLAR:

7  Q    And do you--and was there somebody else with the

8    Defendant who you've identified and we know now is Mr.

9    Henderson?

10 A    Yes, the gentleman in the gray hoodie.

11         MS. MCKELLAR:  Your Honor, may the record

12   reflect that this witness has identified Defendant Gibbs?

13         THE COURT:  Any objections?

14         MR. SKINNER:  Take no position.

15         THE COURT:  All right then the record will

16   reflect that this witness has identified the Defendant

17   Phillip Charles Gibbs.

18 BY MS. MCKELLAR:

19 Q    And when you saw these, the two Defendants, you made a

20   statement that they said, who were they talking to?

21 A    To my husband and Jeremy.

22 Q    And where were you at?

23 A    I was sort of back in a corner, sitting in a chair

24   reading.

25 Q    And what, if anything, did your husband, Costas, and Mr.

LASER BOND FORM B  ®  PENGAD • 1-800-631-6989 • www.pengad.com

1      Jeremy Kassing do when they told them that the Xbox game

2      wasn't working?

3  A   My husband told Jeremy to get the game console and hook

4      it up so that they could test the game and find out what

5      was wrong with it.

6  Q   And did you see whether or not Jeremy Kassing did that?

7  A   Yes, they were doing that.

8  Q   And while they were hooking up the Xbox system to check

9      the game, did anything happen?

10  A   I did not see anything happen because I was reading but I

11      heard a loud crack and I thought that the game shorted

12      out or something so I stood up and--

13  Q   You hear a loud crack, is that correct?

14  A   Correct.

15  Q   And so you stand up?

16  A   Right.

17  Q   And when you, just so you know, I'm asking only what you

18      see and hear; when you stand up, what did you see?

19  A   I saw my husband like going down and I said "what's going

20      on, are you okay", and that's when the gentleman in the

21      gray hoodie came at me.

22  Q   And when you say he came at you, what did he do?

23  A   First thing he did was rip my necklaces off, and then he

24      went for my rings, my one ring I couldn't get--he

25      couldn't get off, and he told me to either get if off or

1       else he would cut it off.  He then started searching all

2       of my pockets.

3   Q  And when this was--you said you saw your husband leaning

4       over and kind of--?

5   A  He was like falling down to the floor.

6   Q  Are you in the same room that he's in at this time?

7   A  We were in the same room but between us was showcases and

8       cash register and computers.

9   Q  Did you see--you testified what the Defendant in the gray

10      hoodie did, when he was doing this, did you see where the

11      other Defendant was?

12  A  I really couldn't see him at that point, I just was

13      focusing on somebody coming at me.

14  Q  And did you ever get your ring off your finger?

15  A  Yeah, real fast.

16  Q  And after your necklace, your jewelry was taken from your

17      person, what happened.

18  A  Then the other gentleman came over and double checked

19      some of my pockets and started, he had the gun, and he

20      was telling my husband go here, go here, into the

21      different rooms asking where the gold was, where's the

22      safe.

23  Q  You testified that you saw the other gentleman, the one

24      you testified--?

25  A  In the orange jumpsuit.

1   Q   --had a gun?

2   A   Yes.

3   Q   And when is the first time you saw the gun?

4   A   When he came at me double check my pockets.

5   Q   Can you describe the gun in any way?

6   A   It was silver with, it looked like my memory, about a six

7       inch barrel, it was like a Dirty Harry 44 Magnum, huge.

8   Q   You testified that you observed the Defendant in the

9       orange ordering your husband around?

10  A   Yes.

11  Q   And did you see, did you hear what the Defendant in the

12      orange was saying to your husband?

13  A   When he had him back in the office, I heard him yelling

14      at him "come on, I'll shoot you, I'll shoot you".

15  Q   And when you say he had him in the office, where is the

16      office located?

17  A   In the back room.

18  Q   So that's a separate room?

19  A   Yes.

20  Q   Did you--could you see into the office?

21  A   No, I could not.

22  Q   During the--did you see the Defendant in the orange and

23      your husband go into the office?

24  A   I could not see them enter the office, there's another

25      door between the office and where I was.

13

1    Q    And during this period of time, did you, could you see or

2         did you know where Jeremy Kassing was?

3    A    Yes, he was down on the floor.

4    Q    And in what room was he down on the floor?

5    A    Same room I was in.

6    Q    When the Defendant in the orange took you husband back

7         into the office, where was the Defendant that you

8         identified in the gray hoodie; where was he located?

9    A    He stayed in the same room with Jeremy and myself.

10   Q    How long was your husband and the Defendant in the back

11        room, in the back office?

12   A    Probably about three or four minutes.

13   Q    And what happened when they came out?

14   A    He was yelling at my husband "come on, move it" using

15        racial slurs, my husband had blood running down the side

16        of his face.  He had told the other young man when he

17        took my husband in the back, to get the lap tops and

18        Netbooks out of the showcase and I actually went behind

19        the counter and got them out for him because he didn't

20        seem to want to go back there and then he was looking for

21        something to carry all of the items that they were taking

22        in, he tossed a duffle bag to the other guy and went back

23        and that was when he found my purse and he, which I carry

24        a large purse normally, and he dumped most of the stuff

25        out on the floor and then crammed some, a bunch of stuff

                                    14

1       in the purse.

2  Q  And when you say he grabbed your purse, who are you

3       referring to?

4  A  In the orange.

5  Q  And when you said that he told the other person to get

6       the notebooks and the lap tops, who's telling?

7  A  In the orange was telling the one in the gray to get

8       them.

9  Q  And when he told the Defendant in the orange to get the

10      lap tops and the notebooks, is that when you went behind

11      the counter and you got them?

12  A  He was trying to reach over the--

13  Q  Okay, when you say he, who are you talking about?

14  A  Gray hoodie, I'm sorry.

15  Q  Okay, the Defendant in the gray hoodie is trying to reach

16      where?

17  A  Over the counter and open up the door to get the lap tops

18      out and he said "they're locked, I can't get it", I said,

19      "no, they're not, you can go behind there and get them",

20      and he didn't seem to want to go behind the counter.  I

21      said, if you want, I'll go back and get them for you and

22      he said okay, so I went back and I took them out of the

23      showcase and sit them up on top of the showcase and he

24      was piling them all up.

25  Q  And is this occurring in the room that you and Jeremy

1     Kassing are in?

2  A    Yes.

3  Q    Did Jeremy Kassing move during this time period?

4  A    No.

5  Q    And did, when you loaded up the computers, what did you

6     do with them?

7  A    I set them on top of the showcase and that was it.

8  Q    Did you see if anyone took them from the showcase?

9  A    Yes.

10  Q    And who did you see take them from the showcase?

11  A    In the gray.

12  Q    How many--okay, and after the Defendant in the gray took

13     the computers, what happened?

14  A    That was when the one in the orange came out, he tossed

15     him like a duffle bag and was putting stuff down in the

16     duffle bag, then he went and got my purse, put more stuff

17     in my purse.

18  Q    Took stuff out of your purse?

19  A    Yes.

20  Q    And put it where?

21  A    Just left it in a pile on the floor.

22  Q    And during this time period, did you see what the

23     Defendant in the gray was doing?

24  A    Trying to cram everything in, down in there.

25  Q    In the same duffle bag?

LASER BOND FORM B   PENGAD • 1-800-631-6989 • www.pengad.com

1   A   Yeah.

2   Q   And what did you personally see being put in the duffle

3       bag?

4   A   The computers and the Netbooks in my purse, he was

5       putting cameras that he'd taken out of the, the one in

6       the orange had taken out of another showcase and at that

7       point, I didn't know what all he had gotten out of the

8       office and the safe, but he was putting that stuff in

9       there also.

10  Q   And did your husband come out of the back office as well?

11  A   He was, when they, they came out together.

12  Q   And is that when you saw the blood coming down from your

13      husband's head?

14  A   Yes.

15  Q   And after the Defendants were finished putting the stuff

16      in the duffle bag, what happened?

17  A   Then they left.

18  Q   How many weapons did you see?

19  A   I saw one.

20  Q   Were any weapons taken from your store?

21  A   Yes.

22  Q   And where, and what--define a weapon?

23  A   It was a Beretta; nine millimeter.

24  Q   And where was that kept?

25  A   In the safe.

1    Q    Was any money taken from your store?

2    A    Yes.

3    Q    And what money was taken?

4    A    There was money taken out of my pocket, out of the

5         register, out of my husband's pocket.

6    Q    When you, when the Defendants first walked in, were you

7         able to see a gun on the Defendant in the orange?

8    A    No.

9              MS. MCKELLAR:  May I have one moment, your

10        Honor?

11             THE COURT:  Certainly.

12   BY MS. MCKELLAR:

13   Q    Do you know whether or not your husband has video

14        equipment, video surveillance in the store?

15   A    Yes.

16   Q    And does he?

17   A    Yes.

18   Q    And did you provide that to the police?

19   A    Yes.

20   Q    After the Defendants left, what did you do?

21   A    Called 911, reported that we just had an armed robbery,

22        we needed an ambulance and a cruiser there, went out the

23        door.  My husband and Jeremy went east towards Dort

24        Highway; I went west towards Franklin to see if we could

25        see which direction they were going in.

1  Q   And could you?

2  A   I found them.

3  Q   And did you tell the police what--?

4  A   Yes.

5  Q   Now when you say you found them, where did you, when you

6      say you found them?

7  A   I saw them.

8  Q   And are your referring to the two Defendants in the

9      courtroom?

10 A   Yes.

11 Q   And where did you see them at?

12 A   I saw them on the corner of Lynch and Illinois.

13 Q   And did you just give that information to the police, or

14     did you do anything further?

15 A   I did not proceed any farther; I gave the information to

16     the police.

17           MS. MCKELLAR:   Thank you, I have no further

18     questions.

19           THE COURT:   All right Cross-Exam Mr. Skinner.

20               CROSS-EXAMINATION

21 BY MR. SKINNER:

22 Q   All right.  Witness, you indicated that this occurred on

23     October 26th, of this year and that it occurred in the

24     morning or in the afternoon?

25 A   P.M.

1   Q   And between 12 p.m. and 6 p.m?

2   A   Correct.

3   Q   Okay.  You indicate that the name of this business is

4       Wholesale 4 U?

5   A   Yes.

6   Q   And is that, is that just a fancy name for a pawn shop or

7       is it just, you just retail goods and you don't take

8       pledged goods in exchange for maybe a cash advance?

9   A   No, we do not pawn.

10  Q   Well, in other words--

11  A   We buy, sell and trade.

12  Q   Well, in other words, if I come into your Wholesale 4 U,

13      and I have a lap top computer and you look at that lap

14      top and you say "Mr. Skinner, we'll give you ten bucks

15      for that lap top" and in your mind you know the lap top's

16      worth $100, do I have the opportunity to come back in a

17      week and repurchase that lap top for $10, or maybe $15?

18  A   No, we have to hold the merchandise for ten days.

19  Q   Why is that?

20  A   Because that's the way the law works.

21  Q   What law are you referring to?

22  A   Flint City law.

23  Q   I mean, does it have a name?  That sounds to me like a

24      pawn shop.

25              THE COURT:  Is that a question, Mr. Skinner, or

20

1    is that testimony?

2              MR. SKINNER:  That is a question.

3    BY MR. SKINNER:

4    Q    Is that a pawn shop, Wholesale 4 U?

5    A    We do not pawn.

6              MR. SKINNER:  I just, I don't understand that,

7    your Honor.

8              THE WITNESS:  When you pawn, you take the

9    merchandise in, you hold the merchandise, the customer

10   can make payments on it and pay interest on it and

11   retrieve it when they pay the loan back.  We do not give

12   loans on merchandise, we buy it outright, we download all

13   of the information, we get signature, fingerprints,

14   download all of the information to the police.  We hold

15   the merchandise for ten days and then we can put it out

16   on the floor for re-sale.

17   BY MR. SKINNER:

18   Q    Suppose I, suppose you give me $10 for my lap top

19   computer and on day nine I come back, how much would it

20   cost for me to get my computer, my lap top computer back?

21             MS. MCKELLAR:  Your Honor, I'm going to object,

22   just on the relevancy of this line of questioning.

23             MR. SKINNER:  I just want, they brought it up,

24   Judge.  And they--

25             THE COURT:  What's the response as to whether

1    it's relevant?

2              MR. SKINNER:  Your Honor?

3              THE COURT:  She had an objection is that it's

4    irrelevant; your response to that.

5              MR. SKINNER:  Well it is relevant because I

6    want to know more information about the Xbox, who owned

7    the Xbox.  The witness testified that Mr. Henderson, the

8    gentleman in orange, brought in the Xbox but I'm thinking

9    as I look back in the police report, maybe someone else

10   purchased the Xbox initially so, that's kinda why I'm

11   asking.

12             THE COURT:  All right, anything further?

13             MS. MCKELLAR:  No, your Honor.

14             THE COURT:  The objection is sustained.

15             MR. SKINNER:  Thank you.

16             THE WITNESS:  I'm sorry?

17             THE COURT:  No, he needs to move on, it's

18   sustained.  Her objection is sustained.

19             MR. SKINNER:  Oh, you're sustaining, okay,

20   Judge.

21             THE COURT:  Exactly, I'm deeming it irrelevant

22   to these proceedings.

23             MR. SKINNER:  Okay, Judge.  Could she answer

24   the question as far as whether or not I could repurchase

25   my lap top computer for--?

1          THE COURT:  That was the question that she

2     objected to, okay, so the ruling has been made; that is

3     irrelevant to this preliminary examination.

4          MR. SKINNER:  Yes, Judge.

5  BY MR. SKINNER:

6  Q    What's a silent alarm?

7  A    It's an alarm where no sirens are blaring.

8  Q    Do you have a silent alarm there at Wholesale 4 U?

9  A    Yes, we do.

10 Q    Did you have such a system on October 26th of this year?

11 A    Yes.

12 Q    And did that, did someone, did you, did you activate that

13     silent alarm system?

14 A    No, I did not, not personally.

15 Q    Now you've watched the video of what occurred?

16 A    Yes.

17 Q    And so do you recall in the video you're drinking

18     something out of a glass?

19 A    Yes.

20 Q    Was that water?

21 A    No, it was Coca Cola.

22 Q    So you hadn't consumed any alcoholic beverages that

23     afternoon?

24 A    No, I did not.

25 Q    Now the two customers that left shortly after you

1    arrived, I mean was that when you started work that day?

2  A    No.

3  Q    What, were you out to lunch?

4  A    No, I had just gotten off work when I came in there?

5              THE COURT:  You work at another place, a

6       location?

7              THE WITNESS:  Yes, I own my own business.

8              THE COURT:  All right.

9  BY MR. SKINNER:

10 Q    And you indicated that there were two gentlemen in the

11      store just before you, I mean when you arrived, there

12      were a couple of gentlemen in the store; correct?

13 A    Yes.

14 Q    What was their ethnicity?

15 A    Black.

16 Q    Okay.  And had you seen those two gentlemen before, these

17      customers?

18 A    Not that I can recall.

19 Q    Were they on the video?

20 A    Yes.

21 Q    And then your testimony is that after the two gentlemen

22      left and these two young men came in, who you've

23      identified here this afternoon, is that correct?

24 A    Yes.

25 Q    And several times in your answers on Direct, you used the

1    term "told", in other words, you said that the gentleman

2    in orange told, told the young man, the other young man,

3    to get the lap top. Do you remember using that word,

4    "told"?

5  A  Yes.

6  Q  I'm not trying to split infinitives here but you would

7    agree, Witness, that there's a difference between telling

8    someone to do something and asking them to do something,

9    would you agree?

10 A  Yes.

11 Q  Okay.  And do you recall the gentleman in orange telling

12   the gentleman in the gray hoodie, or wearing the gray

13   hoodie, for the record Mr. Gibbs, he told Mr. Gibbs to

14   retrieve some jewelry and other personal items from your

15   person?

16 A  No.

17 Q  You don't remember testifying to that on direct, did you

18   use the term told?

19 A  No.

20 Q  That the gentleman in orange told the other gentleman,

21   "take the jewelry, the necklace" et cetera?

22 A  No.

23 Q  Do you remember the gentleman in orange telling your

24   husband to do something?

25 A  I remember him pushing him around and from one room to

LASER BOND FORM B    PENGAD • 1-800-631-6989 • www.pengad.com

1     another saying "where's the safe, where's the tapes".

2  Q  And you said--did you say that Mr. Gibbs, the gentleman

3     in the gray hoodie, told you to take the ring off or he

4     was going to cut it off?

5  A  Yes.

6  Q  The video, does that, did that have sound, the video

7     recording, does that have sound?

8  A  No.

9  Q  He said "take the ring off or he was going to cut your

10    finger off"?

11 A  That was what I assumed he meant.

12 Q  He used that term it off "take it off or I'm gonna cut if

13    off"?

14 A  Yes.

15 Q  And where was the other gentleman, is it Kassing, how you

16    pronounce his last name?

17 A  Kassing.

18 Q  Okay.  Where was he, was he like right in front of you

19    laying down on the floor?

20 A  He was not in my sight but he was sitting on the floor.

21 Q  He was sitting on the floor?

22 A  Yes.

23 Q  Pretty close to you, within a couple of feet?

24 A  Probably ten feet.

25 Q  Ten feet in front of you?

1   A   Around showcases and computers, cash register.

2   Q   And how long did all this take?

3   A   Thirteen minutes.

4   Q   How do you know thirteen minutes?

5   A   By the video.

6   Q   And do you know when the silent alarm was triggered, when

7       they--?

8   A   I don't know the exact time.

9   Q   I mean did you start to wonder after a while why that

10      silent alarm, why the police aren't responding, I mean

11      after the silent alarm had been triggered?

12  A   I didn't even know if it had been triggered.

13  Q   Is it the first time you folks have been robbed?

14  A   That's the first time I've ever been robbed.

15  Q   Okay.  Well, the store, the Wholesale 4 U?

16  A   The store was robbed one other time, they had one other

17      armed robbery.

18  Q   And was that this year?

19  A   Yes.

20  Q   What month?

21  A   October.

22  Q   Oh, twice you were robbed?

23  A   Yes.

24  Q   How soon--this occurred on the 26th, the event that we're

25      speaking of this afternoon, but what about the other

1      robbery, was that before or after the 26th of October?

2  A    Before.

3  Q    When?

4  A    October the 8th.

5  Q    So there'd be a video of that?

6  A    Yes.

7  Q    Did you tell the Prosecutor and Sergeant Ellis about

8      that; the earlier robbery?

9  A    Yes.

10  Q    Did you tell the Prosecutor about that?

11  A    I really haven't talked to her that much.

12  Q    Did you tell any prosecutor about that?

13  A    No.

14  Q    Now, you didn't see anyone take this Beretta out of the

15      safe, you only know that is was taken because your

16      husband told you; correct?

17  A    Correct.

18  Q    All right.  You didn't see the--you didn't see Mr. Gibbs

19      take the Beretta?

20  A    No.

21  Q    No didn't see Mr. Biggs--Mr. Gibbs handle any weapon,

22      knife or gun; is that correct?

23  A    No.

24  Q    No, you didn't see him with a gun or a knife or any

25      weapon?

28

1   A   No, I did not.

2   Q   Nor did Mr. Gibbs threaten you with a weapon, did he?

3       Mr. Gibbs, the gentleman in the gray hoodie, on October

4       26th of this year, he did not threaten you with a gun or a

5       knife or threaten harm to you other than this "I'll cut

6       it off, I'll cut the ring off" and you interpreted that

7       to be cut your finger off; is that correct?

8   A   Correct.

9   Q   Okay.  And same question as to your husband or Mr.

10      Kassing; the gentleman in the gray hoodie, for the record

11      Mr. Gibbs, did not threaten any of those individuals; is

12      that correct on October 26th of this year?

13  A   Correct.

14  Q   All right.  Now have you--you were not treated for any

15      injuries sustained on October 26th of this year, is that

16      correct?

17  A   Afterwards.

18  Q   Okay, tell me what your injuries were?

19  A   I'm in physical therapy right now for my neck.

20  Q   And what happened to your neck?

21  A   They're treating it as whiplash from the jerking motion

22      when he broke the chains off of my neck.

23  Q   And you--

24              THE COURT:  Who, he, when you say "he" who do

25      you mean?

29

1          THE WITNESS:  Mr. Gibbs.

2          THE COURT:  All right.

3    BY MR. SKINNER:

4    Q    And who is your treating physician?

5    A    Dr. Palivali.

6    Q    And you have seen that doctor how many times?

7    A    I've seen him one time, this time.

8    Q    One time for whiplash?

9    A    For pain in my neck.

10   Q    Spell that last name.

11   A    P-a-v-a-l-i, wait, no, I'm sorry, P-a-l-i-v-a-l-i.

12   Q    Palivali?

13   A    Correct.

14   Q    And you have seen this doctor, is he a doctor or a

15        chiropractor?

16   A    He's a neurosurgeon.

17   Q    Neurosurgeon?

18   A    Correct.

19   Q    For whiplash?

20   A    That's the treating diagnosis at this time.

21   Q    What about psychiatrist or psychologist?

22   A    No.

23   Q    Are you receiving any therapy for what happened?

24   A    No.

25   Q    The robbery on October 8th, were you present when that

1    occurred?

2  A  No.

3  Q  Did they leave the Xbox, the two gentlemen who robbed

4     you?

5  A  Yes.

6  Q  Did you participate in a corporeal line-up, did you go to

7     a line-up?

8  A  Yes.

9  Q  Was that this year?

10  A  Yes.

11  Q  Were you asked to identify anyone?

12  A  Yes.

13  Q  Were you able to identify anyone?

14  A  Yes.

15  Q  And after the, these two individuals left Wholesale 4 U,

16     your testimony was that you went to the west--now this

17     store faces Davison Road; correct?

18  A  Correct.

19  Q  And you folks leave--you follow them and of course your

20     husband goes to the east, according to your testimony,

21     you go to the west; correct?

22  A  Correct.

23  Q  Now and you saw these two gentlemen who had robbed you

24     folks earlier, is that correct?

25  A  Yes.

31

1   Q   Were they on bikes or were they walking?

2   A   They were on foot.

3   Q   And they were standing on the corner of Lynch and

4       Illinois?

5   A   No, they weren't standing, they were moving.

6   Q   They were moving?

7   A   Yes.

8   Q   Moving in what direction?

9   A   West.

10  Q   On what road?

11  A   On Illinois.

12  Q   Well wait a minute, you must have, I know Lynch runs

13      north and south; correct?

14  A   Correct.

15  Q   And Illinois runs east and west?

16  A   Correct.

17  Q   So you would have gone over a block?

18  A   I went down to the corner.

19  Q   Corner of what?

20  A   Davison Road and Lynch, I looked south and saw, towards

21      Illinois, and saw them at the corner of Illinois and

22      Lynch.

23  Q   And they were standing or moving?

24  A   They were moving.

25  Q   They were moving in a southerly direction?

1  A   No, they were moving in a westerly direction.

2  Q   A westerly direction on Illinois?

3  A   Correct.

4  Q   Did you continue to follow them?

5  A   No, I did not.

6  Q   Did you have a cell phone with you?

7  A   No, Mr. Gibbs took my cell phone.

8  Q   And so you would have turned and gone back to the store?

9  A   Yes, I yelled to my husband, "I see them, there they

10     are".

11  Q   Where was your husband?

12  A   He, at that point, he did not see them down--

13  Q   No, my question to you is where was your husband

14     physically when you turned and yelled to him "there they

15     are"?

16  A   Approximately right in front of the store.

17  Q   Okay, so how far would you have been from the store when

18     you yelled?

19  A   Maybe twenty yards.

20  Q   You wear glasses?

21  A   Yes.

22  Q   Were you wearing glasses on October 26th of this year?

23  A   Yes.

24  Q   At the store, during the robbery?

25  A   Yes.

1    MR. SKINNER:  Judge, I think that's all I have

2 right now, thank you.

3    THE COURT:  All right, thank you.  Cross-Exam,

4 Ms. Taft.

5    MS. TAFT:  I have no questions, Judge.

6    THE COURT:  All right any Redirect?

7    MS. MCKELLAR: No, your Honor.

8    THE COURT:  All right.  Ma'am you are dismissed

9 at this time, if you'll have a seat in the hallway.

10    THE WITNESS:  Thank you.

11    (At 3:09 p.m, witness dismissed)

12    THE COURT:  Would you call your next witness

13 please?

14    MS. MCKELLAR:  Thank you your Honor, the People

15 call Jeremy Kassing.

16    THE COURT:  If you would come forward sir and

17 stand next to the chair I am pointing to.  Raise your

18 right hand please.  Do you solemnly swear or affirm that

19 the testimony you give today will be the truth and

20 nothing but the truth, so help you God?

21    THE WITNESS:  Yes.

22    THE COURT:  All right, you may be seated in

23 that chair please.

24    THE COURT:  And sir you see that there is a

25 microphone in front of you, it is recording and because

34

1       it's being recorded you cannot respond uh-hum or uh-uh,

2       you must say yes or no, you understand?

3                       THE WITNESS:  Yes.

4                       THE COURT:  All right, please proceed.

5                       MS. MCKELLAR:  Thank you, your Honor.

6                               JEREMY KASSING

7                       (At 3:10 p.m., sworn as a witness, testified as

8                       as follows)

9                               DIRECT EXAMINATION

10      BY MS. MCKELLAR:

11      Q     Good afternoon.

12                      THE COURT:  I'm going to need you to speak

13      loudly as well, sir because I'm going to need to hear you

14      and all three of these attorneys as well.  All right.

15      BY MS. MCKELLAR:

16      Q     Could you please state and spell your name for the

17      record?

18      A     Jeremy Kassing, J-e-r-e-m-y K-a-s-s-i-n-g.

19      Q     Thank you Mr. Kassing.  I'd like to draw your attention

20      to October 26th, 2010 and ask where were you employed on

21      that date?

22      A     I'm sorry.

23      Q     Where were you employed on October 26th, 2010?

24      A     Wholesale 4 U, (inaudible)

25                      THE COURT:  I'm sorry, I couldn't hear you.

```
 1                    THE WITNESS:  It's called Wholesale 4 U.

 2                    THE COURT:  All right.

 3   BY MS. MCKELLAR:

 4   Q    You were employed at Wholesale 4 U?

 5   A    Yes.

 6   Q    Okay.  In what capacity were you employed there, did you

 7        just work inside the store?

 8   A    Yes.

 9   Q    And who was your boss?

10   A    Costas Agnas, I can't really pronounce it.

11   Q    Costas though?

12   A    Yeah.

13   Q    And on October 26th, 2010 what shift were you working?

14   A    The, I don't know--

15   Q    What hours?

16   A    I worked ten to, ten to six.

17                    THE COURT: 10 a.m. to 6 p.m.?

18                    THE WITNESS:  Yes.

19                    THE COURT:  All right, thank you.

20   BY MS. MCKELLAR:

21   Q    And during the evening hours of your shift, did anything

22        unusual happen?

23   A    Yes, we got robbed.

24   Q    Okay.  And when you got robbed, right before you got

25        robbed, who was in the store?
```

36

1    A    It was me and the boss and his wife.

2    Q    The boss being Costas?

3    A    Yes.

4    Q    And his wife, do you know his wife's name?

5    A    Nancy.

6    Q    And what were the--were you working at that time?

7    A    Yes.

8    Q    And what happened?

9    A    Guys come in, come in and had bought a game earlier and

10        said the game didn't work and looked at, it looked good

11        and nothing wrong with it.

12   Q    And real quick, were you in the store earlier when the

13        game was purchased?

14   A    Yes, cause I sold it to them.

15   Q    Okay, did you sell it to the same two individuals?

16   A    Yes.

17   Q    And do you see the two individuals in the courtroom

18        today?

19   A    Yes.

20   Q    And can you identify them, please?

21   A    The guy right there in the middle and the one on the end.

22   Q    And what color?

23   A    The orange, right there and then the sweatshirt there,

24        the gray sweatshirt.

25   Q    Now you testified the guy in the orange, is that correct,

37

1      did you say that?

2  A    Yeah, yeah.

3  Q    Now, what did the gentleman sitting here in the orange?

4  A    No, the guy in the gray too.

5  Q    Only there's two people, correct?

6  A    Yes.

7  Q    And you see the two people that came in to your store?

8  A    Yes.

9  Q    Okay.  Now, and they are the same two people that came in

10      earlier to purchase?

11  A    Yes.

12  Q    And when you say Xbox, are we talking about the whole

13      game system, or are we talking about just a game?

14  A    No, just a little disk.

15  Q    Okay.  And who brought the game back, if you remember, do

16      you remember one of the two people having the game?

17  A    I just, he just said, I don't remember really who had the

18      game, they just said the game didn't work and I looked at

19      it, it looked good.  I asked Costas, he looked at, it

20      looked good and he told me to hook it up.

21  Q    And what did that mean to you?

22  A    That means to me that I need to go get a game system and

23      hook it and make sure it's gonna work, cause if it worked

24      then we were just going to send them on their way.  If it

25      didn't work, then we was gonna swap it out.

38

1  Q   And where did you go to hook up a game system to check

2      the game to see if worked?

3  A   Right in front of the display counter there's a, we have

4      a TV set up, I was just plugging things in, getting

5      things set up.

6  Q   And is the same room, one room?

7  A   Yeah.

8  Q   Is that a yes?

9  A   Yes.

10 Q   And when you went to hook up, to see if the game worked,

11     did anyone go with you?

12 A   No, actually Costas went to get the plugs for the game

13     system cause we kept getting the wrong plug and when he

14     was bringing the game system back is when they actually

15     hit him with the gun.

16 Q   Okay.  Where were you at during this time?

17 A   I was standing next to a display case.

18 Q   And where were the two customers at the time?

19 A   They, one was standing at one display, the TV, there's a

20     display case right here, there's a TV right here, another

21     big countertop right here, I was right here hooking the

22     TV up, Gus was back here getting the wires, as he come

23     up, they came from the front door here, the one was

24     standing, the one in the sweatshirt was standing next to

25     the display case.

39

1   Q     Okay.   Now, you just testified the one in the sweatshirt,

2         is that correct?

3   A     Yes.

4   Q     Okay.   And he was where?

5   A     He was just standing next to the display case.

6               MS. MCKELLAR:   Okay.   Your Honor, may the

7         record reflect that this witness has identified the

8         Defendant, Phillip Charles Gibbs?

9               THE COURT:   Any objection?

10              MR. SKINNER:   Take no position, Judge.

11              THE COURT:   All right then the record will

12        reflect that this witness has identified the Defendant,

13        Phillip Charles Gibbs.

14  BY MS. MCKELLAR:

15  Q     Okay.   You told us where the Defendant in the sweatshirt,

16        Defendant Gibbs was, and then what happened?

17  A     Yes.

18  Q     And then what happened?

19  A     The other guy was, kept pacing back and forth on the

20        phone talking to someone.

21  Q     And do you see the other guy who was on the phone?

22  A     Yes, he's in the orange.

23              MS. MCKELLAR:   Your Honor, may the record

24        reflect this witness has identified Tyrell Henderson?

25              MS. TAFT: Judge, may I Voir Dire?

1       THE COURT:  Certainly.

2                       VOIR DIRE

3  BY MS. TAFT:

4  Q    Mr. Kassing, did you take part in a line-up?

5  A    Yes.

6  Q    And did you identify anybody in that line-up?

7  A    Yes.

8  Q    You did?

9  A    Yes.

10  Q    So if the notes that I received indicated that you, you

11       did not, that would be wrong?

12  A    There was two line-ups, I did.

13  Q    Oh, I'm sorry, true, that's true, I'm sorry.  At one

14       line-up who did you identify?

15  A    The one in the sweatshirt.

16  Q    And at the second line-up?

17  A    I didn't identify anybody.

18  Q    You didn't?

19  A    No.

20  Q    So, was my client in that line-up?

21  A    I don't recall he was.

22  Q    Well, if you were unable to identify him back on the 9th

23       of December, what is it about him today that makes you

24       sure that he's the person who was in the store?

25  A    The spot on his head.

                            41

1          THE COURT:  I'm sorry, I can't hear you.

2          THE WITNESS:  The little spot on his head

3     there.  He took his hat off and it was--

4  BY MS. TAFT:

5  Q    Did he have a hat on in the line-up?

6  A    He had a hat on, he kept taking it off and rubbing his

7     head.

8  Q    At the store?

9  A    Yes.

10 Q    I understand that but did he have a hat on at the line-

11    up?

12 A    No.

13 Q    And are you saying that you saw no one in that line-up

14    who had this spot on their head?

15 A    It didn't click on to me at the time.

16 Q    Okay.

17 A    You know it happened so fast I'm never really, this is

18    the first time I ever had a gun put in face, you know

19    things were kinda traumatic at the time.  Things are

20    still coming back to me now, still having dreams about

21    it.

22 Q    Okay.  So the, the cue for you then is the--

23         THE COURT:  If people are going to laugh, I'm

24    going remove you from this courtroom.  Do it one more

25    time and you're out of here, am I perfectly clear?

1    Somebody better respond or I'll empty this courtroom now.

2    LADY IN COURTROOM: Yes ma'am.

3    THE COURT: All right, thank you.

4  BY MS. TAFT:

5  Q    So, what you're telling me is that you recognize him

6       today because he has a birthmark or a dark--?

7  A    No, I, it's his face, right now I'm looking at him right

8       now, I mean, I'm, what I was saying was, when they did

9       the line-up, I didn't really recognize him because, you

10      know, it was so traumatic, you know I was, I'm still

11      trying to get past it right here. And, now I'm sitting

12      here looking at him like, I can positively say yes,

13      that's him.

14 Q    So, you're positive this is the man you saw?

15 A    Yes.

16      MS. TAFT: Thank you.

17      THE COURT: All right. Any objections to the

18   identification Ms. Taft?

19      MS. TAFT: No, Judge.

20      THE COURT: All right then the record will

21   reflect that this witness has identified the Defendant,

22   Tyrell Henderson.

23      MS. MCKELLAR: Thank you, your Honor.

24 BY MS. MCKELLAR:

25 Q    And what did you see Defendant Henderson do?

LASER BOND FORM B   PENGAD • 1-800-631-6989 • www.pengad.com

1    A    He hit Costas with the gun, back of his head, when he did

2         that he put the gun in my face, told us to--

3    Q    He puts the gun in who's face?

4    A    Everybody's face, you know just put, you know "get your

5         pockets out, empty your pockets out" you know, then they

6         started ripping the rings and stuff off, and necklaces

7         off of Costas, while the other guy with the sweatshirt

8         was taking the jewelry off of his wife Nancy.

9    Q    Was anything taken out of your pockets?

10   A    Yes, my wallet, and that was it.  They, he had--

11                 THE COURT:  Wait a minute, you are not

12        responding to a question at this time, I just need you to

13        respond to her questions.  She asked you was anything

14        taken from you.  Okay?

15                 THE WITNESS:  Yes, yes.

16   BY MS. MCKELLAR:

17   Q    And then what did, what happened?

18   A    Then they guy over here took the, took those, took Costas

19        with the--

20   Q    Now you say the guy over here?

21   A    Yeah, the guy in the orange, I don't know his name.

22   Q    That's Defendant Henderson.

23   A    Henderson took him over, took Costas into the backroom.

24   Q    And where are you at now?

25   A    I'm in the front room still.

1   Q    And are you, where are you physically; are you standing,

2        or are you--?

3   A    I'm sitting on the ground, leaning against the glass

4        case, just sitting there.  What else can I do, I mean,

5        the guy puts a gun in your face and says "sit down", I

6        can't do nothing.

7              THE COURT:  Just a minute sir, I want you to

8        remember one thing.

9              THE WITNESS:  Yes.

10             THE COURT:  You just need to respond to the

11       questions and I hear you saying that you're still, you

12       know, dealing with some trauma, but it's very important

13       for these proceedings that you stay focused and just

14       respond to the questions that are asked.

15             THE WITNESS:  Okay.

16             THE COURT:  Thank you.

17             MS. MCKELLAR:  Thank you, your Honor.

18  BY MS. MCKELLAR:

19  Q    Now you testified that Defendant Henderson in the orange

20       took Costas in the backroom?

21  A    Yes.

22  Q    And is that something you saw?

23  A    I saw him take him into the backroom, yes.

24  Q    And did you, you personally, did you hear anything while

25       this was going on?

1   A   No.

2   Q   And what's the next--okay, did you hear anything?

3   A   I heard something, they was yelling about, "we got three

4       minutes" or "it's been three minutes", and then that's

5       about it, that's about all I heard them yelling back and

6       forth.

7   Q   And did any, after you were on the ground, did any,

8       either of the--did the Defendant Gibbs in the sweatshirt,

9       did he approach you again?

10  A   No.

11  Q   Did Defendant Henderson in the orange, did he approach

12      you again?

13  A   Yes.

14  Q   And when?

15  A   That was when he was rummaging through my front pockets

16      to make sure I didn't have nothin' else.

17  Q   And when is the first time you saw the gun?

18  A   First time I saw the gun was after he had hit Costas with

19      it.

20  Q   And did you see Defendant Henderson hit Costas with the

21      gun?

22  A   No.

23  Q   How do you, is that something you were told or?

24  A   No.

25  Q   Okay, how did you know?

1   A   Cause I heard the smack and he, when he fell against me,

2       I, you know, it was, it was like they were like lined up

3       together.  When he got done, it was in his hand.

4   Q   What was in his hand?

5   A   The gun.

6   Q   Was in Defendant Henderson's hand?

7   A   Yes.

8   Q   Okay.  Who fell against you?

9   A   Costas did.

10  Q   And you testified that your wallet was the only thing

11      taken from your person; is that correct?

12  A   Yes.

13              MS. MCKELLAR:  One moment, your Honor.

14              THE COURT:  All right.

15              MS. MCKELLAR:  Thank you Mr. Kassing, I have no

16      further questions.

17              THE COURT:  All right.  Cross-Exam Ms. Taft,

18      let's start with you this time.

19                          CROSS-EXAMINATION

20  BY MS. TAFT:

21  Q   Mr. Kassing, what time earlier that day had the game been

22      purchased?

23  A   Right after we opened so probably, I don't know maybe

24      ten-thirty, eleven o'clock.

25  Q   And when the two gentlemen came back in that morning, or

LASER BOND FORM B   ®   PENGAD • 1-800-631-6989 • www.pengad.com

1          that evening, did you recognize them?

2    A    Yeah, they'd been there quite a bit.

3    Q    On other occasions?

4    A    Oh yeah, they, the one in the sweatshirt's come in quite

5         a bit on, looking at games and buying games.

6    Q    So they're regular customers?

7    A    Yes, so I had no problem with bringing them in.

8    Q    I see.  Did you see the two men leave the store?

9    A    Yes.

10   Q    Was the gun still visible when they left the store?

11   A    No.

12   Q    Did you see where the gun went?

13   A    I believe he stuck it in his sweatshirt.

14   Q    Okay.  What was--

15                THE COURT:  Which he?

16                THE WITNESS:  I'm sorry.

17                THE COURT:  Which he, sir?

18                THE WITNESS:  The guy in the orange.

19                THE COURT:  Okay.

20   BY MS. TAFT:

21   Q    What was the guy in the orange wearing when you saw him

22        that day?

23   A    He had a black hat, I'd say like a, like a, some kind of

24        a dark orange or a red sweatshirt, jeans.

25                THE COURT:  What color sweatshirt?

48

1    THE WITNESS:  No, it was like a, I think it was

2    a white one; he had the one that had the dark clothes on.

3    THE COURT:  So tell me, tell, respond to--

4    THE WITNESS:  The guy in the orange had a white

5    sweatshirt on.

6    THE COURT:  Okay.

7    THE WITNESS:  And then the guy in the

8    sweatshirt over here had a darker colored shirt on, I

9    don't know what color it was, I remember he had this

10   furry hat that was, come over the ears.

11   MS. TAFT: Who did?

12   THE WITNESS: The guy in the sweatshirt.

13 BY MS. TAFT.

14 Q    And you said that there was something said about "it's

15      been three minutes", this was between the two gentlemen

16      that were in the store?

17 A    Yes.

18 Q    Did you hear any other conversation going on?

19 A    Just the guy in the orange on the phone with somebody.

20 Q    Okay.  Could you hear the conversation?

21 A    I could hear him talking on the phone, I couldn't hear

22      what the other person on the phone was saying.

23 Q    Okay.  And you sat on the floor near a showcase?

24 A    Yes.

25 Q    Were you a part of collecting the things that were taken

```
 1        from the store?

 2   A    No.

 3   Q    Did you observe what was taken from the store?

 4   A    Yes.

 5   Q    So you were--

 6   A    I observed some of the stuff that was taken from the

 7        store; I didn't observe everything that was taken.

 8   Q    Okay.  Were you able to see the gentleman in the gray

 9        sweatshirt the entire time they were in the store?

10   A    Yes.

11              MS. TAFT:  I don't have any other questions.

12              THE COURT:  All right, Cross, Mr. Skinner.

13                   CROSS-EXAMINATION

14   BY MR. SKINNER:

15   Q    Mr. Kassing, were you there when the store was robbed a

16        couple of weeks earlier?

17   A    Yes, I had just started.

18   Q    Just started working there?

19   A    I was there about two weeks.

20   Q    You ever been convicted of a crime involving theft or

21        dishonesty within the past ten years?

22   A    Yes.

23              THE COURT:  Let him finish his question, sir.

24              MR. SKINNER:  I tend to go, I speak slowly

25        sometimes.
```

LASER BOND FORM B   ® PENGAD • 1-800-631-6989 • www.pengad.com

1          THE COURT:  Sometimes?  Go ahead.  I had to say

2     that, Mr. Skinner.

3          MR. SKINNER:  Go ahead and answer the question.

4          THE WITNESS:  No, I have not in the past ten

5     years, no.

6  BY MR. SKINNER:

7  Q    You have identified two gentlemen in the courtroom this

8     afternoon as having been present on October 26th, at the

9     store, this Wholesale 4 U, one of them is wearing orange

10     and the other one is wearing, we've used the expression

11     or term, gray hoodie.  The gentleman wearing the gray

12     hoodie, for the record, sir, his last name is Gibbs, can

13     you remember that, Gibbs?  Did Mr. Gibbs, on October 26th

14     of this year threaten you with a gun or a knife or any

15     other weapon?

16  A    No, he didn't show any weapons.

17  Q    Okay.  Well, when you say he didn't show any weapons, you

18     didn't see him, Mr. Gibbs, with any weapons?

19  A    I didn't see him with any weapons at all.

20  Q    And he, Mr. Gibbs, on October 26th of this year, did not

21     threaten you verbally with a weapon, "I'm gonna shoot

22     you", "I'm gonna stab you", nothing to that effect; isn't

23     that true?

24  A    No, he didn't say nothing.

25  Q    He didn't say anything?

51

1   A   No.

2   Q   As a matter of fact, now Mr. Kassing, isn't it true that

3       the gentleman in the orange did most of the talking, most

4       of the yelling, I think you used that term; yelling, or

5       the gentleman in the orange was doing all the talking

6       while this robbery occurred on October 26th of this year;

7       isn't that true?

8   A   Yes.

9   Q   Okay.  And again, I don't want to put words in your mouth

10      Mr. Kassing, but was it your impression that the

11      gentleman in orange was the leader, I mean he was like

12      the man during this robbery?

13  A   Yes, it is.

14  Q   Your answer is yes, don't be shy, speak up, yes?

15          THE COURT:  Okay, it's nothing funny going on

16      in this courtroom, this is your final warning.  Any one

17      laugh, everybody's out of here, I'm going to clear the

18      courtroom, it's not tolerated in this courtroom, it's

19      very serious.

20          MR. SKINNER:  And Judge, for the record, I

21      don't ask these questions with the intention of inviting-

22      -

23          THE COURT:  And I know you don't, I know you

24      don't.

25          MR. SKINNER:  Because there's nothing humorous

LASER BOND FORM B  ®  PENGAD • 1-800-631-6989 • www.pengad.com

1       about what's going on.

2                   THE COURT:  Exactly, but I expect people who

3       are observing in the courtroom to have certain conduct

4       and if it doesn't happen I ask them to leave, all right?

5                   MR. SKINNER:  Thank you.  May I continue,

6       Judge?

7                   THE COURT:  Please.

8    BY MR. SKINNER:

9    Q    Mr. Kassing, sir were you injured as a result of this

10        robbery on October 26th?

11   A    No.

12   Q    Okay.  And sir have you participated in or received any

13        counseling or therapy as a result of what occurred?

14   A    No.

15   Q    Okay.  Have you made an appointment or is your intention

16        to?

17   A    No.

18   Q    Okay.  All right.

19                  THE COURT:  What was his response, I didn't

20        hear his response.

21                  THE WITNESS:  No.

22                  THE COURT:  Okay.

23   BY MR. SKINNER:

24   Q    And sir did you have any personal property of yours, not

25        store property, but personal property of your own, that

1      was taken on that day?

2   A   Yes.

3   Q   What was taken sir?

4   A   My wallet, pictures, personal--

5   Q   Was there money in your wallet?

6   A   I think there was five bucks in there, and two gold

7      coins, they were like the gold plated quarters, little

8      cheap things; a keepsake.

9   Q   And you're wearing glasses this afternoon sir, were you

10     wearing glasses on, when the robbery occurred?

11  A   Yes.

12  Q   Okay.  All right.  Do you have any difficulty hearing or?

13  A   No.

14  Q   Okay.  You near sighted or far sighted, do you know the

15     difference?

16  A   No.  I can't see far away, I can see up close but that's

17     all.

18  Q   You can see up close?

19  A   Yes.

20  Q   Okay, that would be near sighted for future reference.

21          MR. SKINNER:  Thank you, that's all I have.

22  Thank you Mr. Kassing.

23          THE COURT:  All right, any Redirect?

24          MS. MCKELLAR:  No, your Honor.

25          THE COURT:  All right sir, you are dismissed;

54

1     if you'll have a seat in the hallway again, please.  And

2     at this point, the Court is going to discontinue

3     proceedings and we will talk about a date to finish this

4     preliminary examination.  Did you want to say something,

5     Ms. McKellar?

6              MS. MCKELLAR:  Your Honor, I believe I am

7     prepared to do a bind over motion.

8              THE COURT:  Okay, all right.  All right then,

9     we won't talk about another date, the People are resting

10    then?

11             MS. MCKELLAR:  Yes, your Honor, the People will

12    rest.

13             THE COURT:  Then I need to ask, any witnesses

14    on behalf of your client; first Ms. Taft?

15             MS. TAFT:  No, Judge.

16             THE COURT:  Mr. Skinner?

17             MR. SKINNER:  Well, absolutely because my

18    suspicion is that the complaint references three victims.

19    How many, the complaint, how many counts?

20             MS. MCKELLAR:  Yes, your Honor, I can ask the

21    question for Mr. Skinner, I will be doing a bind over

22    motion on Costas and, I can't even, Anagnostopoulos.

23             MR. SKINNER:  I'm gonna want to question--my

24    understanding there were three, there was a husband and

25    wife and then Mr. Kassing and Nancy, the wife, has

—55—

1    testified but the husband has not.  If the Prosecutor

2    doesn't wish to question him, that's fine, but I do

3    intend to question him.

4             THE COURT:  Okay, let's just talk about a

5    continuation date.

6             MR. SKINNER:  He was--

7             THE COURT:  There's nothing else necessary to

8    be said.  You have that absolute right to do so.

9             MS. MCKELLAR:  Just for the record, I know not

10   for today, but just for the record, he is here.

11            THE COURT:  All right.  And do you need him

12   brought in to be told that his subpoena is going to be

13   continued?

14            MS. MCKELLAR:  No, no problem.

15            THE COURT:  All right, the Court's earliest

16   availability to complete this matter would be Friday,

17   January 7th, 2011 at 9 o'clock a.m.  Are you available Mr.

18   Skinner, first?

19            MR. SKINNER: Yes.

20            THE COURT:  Ms. Taft?

21            MS. TAFT:  I don't know; I'll make myself

22   available.

23            THE COURT:  All right then that will be the

24   date that we will complete this preliminary examination,

25   January 7th, 2011 at 9 o'clock a.m.

1          MR. SKINNER:  Are we still on the record?

2          THE COURT:  Yes we are still on the record.

3          MR. SKINNER:  If there is nothing further, I

4    wanted to address bond.

5          THE COURT:  You may do so.

6          MR. SKINNER:  When I was last before the Court,

7    the Court indicated that it wanted to hear all of the

8    testimony at the preliminary exam before you made a

9    ruling as to my request that the bond be amended.  Is

10   that still the Court's position?  If it is, I won't waste

11   your time but my client is at the Regional Detention

12   Center, he could be in school.

13         THE COURT:  He is in school there.

14         MR. SKINNER:  I understand, Judge, but no

15   reflection upon the State of Michigan, but I feel like he

16   could get a better education if he were allowed to return

17   to, go back home and attend his regular school.  But,

18   Judge, you've heard enough to know that my client was

19   not, didn't handle the gun, didn't injure anybody during

20   this robbery and you know, his family is here, he's not a

21   flight risk.  There's no history, previous history, of

22   assaultive kinds of behavior on this young man's part,

23   he's gonna be back here on the seventh, if the Court were

24   to release him into the custody of his family, and so for

25   all those reasons, we would ask the Court to amend bond

1    accordingly, thank you.

2            THE COURT:  All right, I'll hear from Ms.

3    McKellar on the issue.

4            MS. MCKELLAR:  Your Honor, the People object.

5    Mr. Gibbs, as Mr. Skinner pointed out, didn't pull out,

6    didn't handle and didn't threaten any weapon, but he was

7    certainly a participant, a very active participant in

8    this robbery, especially the testimony of Nancy, she

9    pronounced her last name, he assaulted her, pulled

10   jewelry off her neck and acted in consort with his co-

11   defendant who had a gun that was used to injure one of

12   the victims in this case and clearly, as the Court's well

13   aware, under Michigan law, you're equally as guilty of

14   under aiding and abetting, he certainly assisted in an

15   armed robbery so that is a very serious offense and I

16   would say for the safety of society that he remain, or

17   that bond remain as is, thank you.

18           THE COURT:  All right.  I do want to note for

19   the record that the information from Court Services

20   indicates, and--can you ask them to just not talk quite

21   as loud?  The information from Court Services indicates

22   and, this is for your information Mr. Skinner, that Mr.

23   Gibbs had at the time they interviewed him, a pending

24   case in Juvenile Court for Breaking And Entering With

25   Intent to Commit A Larceny that had a November 9th, 2010

1    date, he had a prior juvenile adjudication for Attempted

2    Unlawful Entry and the Court has heard testimony that

3    compels this Court to continue the no bond status.

4              MR. SKINNER:   Thank you, Judge, have a good

5    day.

6              THE COURT:   Thank you.

7              MS. MCKELLAR:   Thank you, your Honor.

8              (At 3:36 p.m., case concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF MICHIGAN)
                 ) SS.
COUNTY OF GENESEE)


        I certify that this transcript, consisting
of 60 pages, is a true, complete, and accurate transcript
of the proceedings taken in the case of the State of
Michigan versus Phillip Charles Gibbs, Case Number 10-
1667FYC and State of Michigan versus Tyrell Henderson, Case
Number 10-1668FYC – VOLUME I, on the 29th day of December,
2010 as recorded by Marlene Ragland, CER 8336.




                              Marlene J. Ragland, CER-8336
                              Certified Electronic Recorder
                              (810) 766-8991



DATED:   February 4, 2011