# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 6, 2013

Robert P. Young, Jr.,
Chief Justice

146937

Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
Plaintiff-Appellee,

v

SC: 146937
COA: 306124
Genesee CC: 11-028140-FC

PHILLIP CHARLES GIBBS,
Defendant-Appellant.

_____/

On order of the Court, the application for leave to appeal the February 14, 2013 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court. See *People v Harmon*, 248 Mich App 522, 532 (2001) (permitting an OV 13 score in the case of four concurrent convictions).



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 6, 2013



s1030

Clerk

## STATE OF MICHIGAN

## IN THE SUPREME COURT

**PEOPLE OF THE STATE OF MICHIGAN**

        Plaintiff-Appellee,

-vs-

**PHILLIP CHARLES GIBBS**

        Defendant-Appellant.

_____ /

**GENESEE COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

_____

**RANDY E. DAVIDSON (P30207)**
Attorney for Defendant-Appellant

_____

Supreme Court No. _Publ Opin 2-04-13_

Court of Appeals No. 306124

Lower Court No. 11-28140FC

_Genesee_
_J. Fullerton_

_146937_
_APIC_
_4/30_
_State_

## NOTICE OF HEARING

## APPLICATION FOR LEAVE TO APPEAL

## NOTICE OF FILING APPLICATION FOR LEAVE TO APPEAL

## PROOF OF SERVICE

**STATE APPELLATE DEFENDER OFFICE**

BY:   **RANDY E. DAVIDSON (P30207)**
       **Assistant Defender**
       Suite 3300 Penobscot
       645 Griswold
       Detroit, MI 48226
       (313) 256-9833

FILED

APR - 4 2013

CORBIN R. DAVIS
CLERK
MICHIGAN SUPREME COURT

# TABLE OF CONTENTS

INDEX OF AUTHORITIES......................................................................................

STATEMENT OF JURISDICTION.......................................................................... i

STATEMENT OF QUESTIONS PRESENTED ...................................................... iii

STATEMENT OF FACTS.......................................................................................... iv

I.   THE TRIAL COURT VIOLATED MR. GIBBS' SIXTH AMENDMENT RIGHT TO A PUBLIC TRIAL BY CLOSING THE COURTROOM AND EXCLUDING MEMBERS OF HIS FAMILY FROM JURY SELECTION. ......................................10 ..................1

II.  MR. GIBBS' FIFTH AMENDMENT RIGHT TO REMAIN SILENT WAS VIOLATED WHEN THE PROSECUTOR USED HIS PRE-ARREST SILENCE TO IMPEACH HIS EXCULPATORY TESTIMONY AT TRIAL, AND THE PROSECUTOR THEN REFERRED TO THE SILENCE DURING CLOSING ARGUMENT......................................................................................................10

III. BECAUSE THE COURT BELOW MADE THREE GUIDELINES-SCORING MISTAKES, AND CORRECTING THE MISTAKES WOULD SUBSTANTIALLY REDUCE THE GUIDELINES RANGE, MR. GIBBS MUST BE RESENTENCED...18

JUDGMENT APPEALED FROM AND RELIEF SOUGHT ..............................................26

RANDY E. DAVIDSON*S Ct Application for Leave.docx*25680
Phillip Charles Gibbs

# INDEX OF AUTHORITIES

**Cases**

*Combs v Coyle*, 205 F3d 269 (CA 6, 2000) .................................................................. 14, 15

*Commonwealth v Alebord*, 953 NE2d 744 (Mass App, 2011) ........................................ 11

*Feld v Robert & Charles Beauty Salon*, 435 Mich 352; 459 NW2d 279 (1990) .......................... 22

*Gannett Co v DePasquale*, 443 US 368; 99 S Ct 2898; 61 L Ed 2d 608 (1979) ........................ 11

*Girts v Yanai*, 501 F3d 743 (CA 6, 2007) ....................................................................... 15

*Griffin v California*, 380 US 609; 85 S Ct 1229; 14 L Ed 2d 106 (1965) ........................................ 14

*Hoerstman General Contracting, Inc v Hahn*, 474 Mich 66; 711 NW2d 340 (2006) ................. 22

*In re MKK*, 286 Mich App 546; 781 NW2d 132 (2009) ............................................... 20

*In re Oliver*, 333 US 257; 68 S Ct 499; 92 L Ed 682 (1948) ............................................ 10

*Miller v Allstate Ins Co*, 481 Mich 601; 751 NW2d 463 (2008) ...................................... 22

*People v Anderson*, 298 Mich App 178; 825 NW2d 678 (2012) ...................................... 19

*People v Cannon*, 481 Mich 152; 749 NW2d 257 (2008) ............................................... 24

*People v Carines*, 460 Mich 750; 597 NW2d 130 (1999) ......................................... 10, 14

*People v Collier*, 426 Mich 23; 393 NW2d 346 (1986) ............................................ 15, 16

*People v Dendel*, 481 Mich 114; 748 NW2d 859 (2008) ................................................ 10

*People v Francisco*, 474 Mich 82; 711 NW2d 44 (2006) ........................................... 18, 25

*People v Harmon*, 248 Mich App 522; 640 NW2d 314 (2001) ..................................... 23, 24

*People v Hegwood*, 465 Mich 432; 636 NW2d 127 (2001) ............................................ 23

*People v Johnson*, 293 Mich App 79; 808 NW2d 815 (2011) ........................................ 20

*People v Koonce*, 466 Mich 515; 648 NW2d 153 (2002) ............................................... 20

*People v Lee*, 391 Mich 618; 218 NW2d 655 (1974) ................................................... 18

*People v Malkowski*, 385 Mich 244; 188 NW2d 559 (1971) ......................................... 18

*People v McPherson*, 263 Mich App 124; 687 NW2d 370 (2004) ................................... 14

*People v Morson*, 471 Mich 248; 685 NW2d 203 (2004) .............................................. 18

*People v Shane Joseph Smith*, unpublished opinion per curiam of the Court of Appeals,
   decided February 25, 2003 (Docket No. 229137) ................................................... 23

*People v Solmonson*, 261 Mich App 657; 683 NW2d 761 (2004) ................................. 15

*People v Stone*, 195 Mich App 600; 491 NW2d 628 (1992) .......................................... 22

*People v Vaughn*, 491 Mich 642; 821 NW2d 288 (2012) ......................................... 12, 13

*Presley v Georgia*, 558 US 209; 130 S Ct 721; 175 L Ed 2d 675 (2010) ...................... 10, 11, 13

*Press-Enterprise Co v Superior Court*, 478 US 1; 106 S Ct 2735; 92 L Ed 2d 1 (1986) ............. 11

*Salem v Jenkins,* 414 F Supp 2d 687 (ED Mich, 2006) ............................................. 13

*Salinas v State*, 369 SW3d 176 (Tex Crim App, 2012), cert gtd___ US ___; 133 S Ct 928;
   184 L Ed 2d 719 (2013) ................................................................................ 15

*State v Njonge*, 255 P3d 753 (Wash App, 2011) ..................................................... 13

*Taylor v Michigan Public Utilities Comm*, 217 Mich 400; 186 NW 485 (1922) .................. 22

*Tellin ex rel Hinga v Forsyth Twp*, 291 Mich App 692; 806 NW2d 359 (2011) .................. 20

*Townsend v Burke*, 334 US 736; 68 S Ct 1252; 92 L Ed 1690 (1948) ............................ 18

*United States v Gupta*, 699 F3d 682 (CA 2, 2012) .................................................. 10

*US Fidelity Insurance & Guaranty Co. v Michigan Catastrophic Claims Ass'n (On Rehearing)*,
   484 Mich 1; 795 NW2d 101 (2009) ..................................................................... 20

*Waller v Georgia*, 467 US 39; 104 S Ct 2210; 81 L Ed 2d 31 (1984) ........................ 10, 11

i

## Statutes

Const 1963, Art 6, § 15 .................................................................................................. 21
MCL 712A.1 et seq. ........................................................................................................ 21
MCL 712A.1(2) ............................................................................................................... 21
MCL 750.529 ..................................................................................................................... 7
MCL 750.530 ..................................................................................................................... 7
MCL 777.40 ..................................................................................................................... 24
MCL 777.43(1) ................................................................................................................ 25
MCL 777.43(1)(b) ..................................................................................................... 23, 25
MCL 777.43(1)(g) ........................................................................................................... 25
MCL 777.51 ..................................................................................................................... 21
MCL 777.52 ..................................................................................................................... 21
MCL 777.53 ..................................................................................................................... 21
MCL 777.54 ..................................................................................................................... 21
MCL 777.55(3)(b) ..................................................................................................... 21, 22
MCL 777.56 ..................................................................................................................... 20
MCL 777.56(1) .......................................................................................................... 19, 20
MCL 777.56(1)(d) ................................................................................................ 19, 20, 21
MCL 777.56(1)(e) ........................................................................................................... 20
MCL 777.56(3)(b) ........................................................................................................... 22
MCL 777.57 ..................................................................................................................... 24
US Const, Am V .............................................................................................................. 14
US Const, Am XIV .......................................................................................................... 14

## Court Rules

MCR 7.203(A)(1) .............................................................................................................. 8

## Miscellaneous

Black's Law Dictionary (9th ed), p 42 ......................................................................... 21
2A Sands, Sutherland Statutory Construction (4th ed), §47.24, p 203 ......................... 22

## STATEMENT OF JURISDICTION

This is an application for leave to appeal pursuant to Const 1963, art 1, §§ 4, 20; MCL 600.215(3); MCL 770.3(6); MCR 7.301(A)(2); and MCR 7.302(C)(2)(b). Defendant-Appellant was convicted in the Genesee County Circuit Court by jury trial, and a Judgment of Sentence was entered on August 15, 2011. A Claim of Appeal was filed on September 16, 2011 by the trial court pursuant to the indigent defendant's request for the appointment of appellate counsel filed September 6, 2011, as authorized by MCR 6.425(F)(3). The Court of Appeals affirmed Defendant's convictions and sentence in an opinion issued February 14, 2013. This application is being filed within 56 days from the date of the opinion.

## STATEMENT OF QUESTIONS PRESENTED

I.   DID THE TRIAL COURT VIOLATE MR. GIBBS' SIXTH AMENDMENT RIGHT TO A PUBLIC TRIAL BY CLOSING THE COURTROOM AND EXCLUDING MEMBERS OF HIS FAMILY FROM JURY SELECTION?

                              Trial Court answers, "No".

                              Court of Appeals answers, "No".

                              Defendant-Appellant answers, "Yes".

II.  WAS MR. GIBBS' FIFTH AMENDMENT RIGHT TO REMAIN SILENT VIOLATED WHEN THE PROSECUTOR USED HIS PRE-ARREST SILENCE TO IMPEACH HIS EXCULPATORY TESTIMONY AT TRIAL, AND THE PROSECUTOR THEN REFERRED TO THE SILENCE DURING CLOSING ARGUMENT?

                              Trial Court made no answer.

                              Court of Appeals answers, "No".

                              Defendant-Appellant answers, "Yes".

III. BECAUSE THE COURT BELOW MADE THREE GUIDELINES-SCORING MISTAKES, AND CORRECTING THE MISTAKES WOULD SUBSTANTIALLY REDUCE THE GUIDELINES RANGE, MUST MR. GIBBS MUST RESENTENCED?

                              Trial Court answers, "No".

                              Court of Appeals answers, "No".

                              Defendant-Appellant answers, "Yes".

# STATEMENT OF FACTS

## Introduction

On October 26, 2011, the lives of Defendant-Appellant Phillip Charles Gibbs, two Flint pawn-shop owners, and one of the shop's employees were changed forever when Mr. Gibbs -- a mere sixteen years old at the time -- entered the pawn shop with co-defendant Tyrell Henderson and participated in a robbery. Gibbs was unarmed during the crime and insisted he knew nothing of Henderson's plans. Instead, he acted under the very-real stress of knowing that his out-of-control co-defendant might turn the gun on him for failing to assist.

## Trial testimony

It was undisputed that Mr. Gibbs was the more passive actor during the robbery, which was recorded on the store's surveillance system. **Costas Anagnostopoulos**, the owner of Flint-based Wholesale 4 U,[1] testified that around 4:00 p.m. on October 26th, Mr. Henderson entered the store alone and purchased a video game. [Trial 6/29/11, p 252-253]. Henderson later returned, this time with Mr. Gibbs, and claimed the game was not working properly. Mr. Anagnostopoulos directed his employee, Jeremy Kassing, to troubleshoot the problem on the store's Xbox game system. In the meantime, Mr. Anagnostopoulos brought over a power supply to aid with the assessment. It was then that Mr. Henderson hit Mr. Anagnostopoulos suddenly with a gun on the back of his neck, causing him to nearly fall to the ground. Mr. Henderson was pointing the gun at Mr. Anagnostopoulos and ordered him to sit on the floor. Mr. Henderson then demanded and took Mr. Anagnostopoulos' rings, neck jewelry, wallet, and money at gunpoint. [Trial 6/29/11, p 258-263]. He also ordered Mr. Anagnostopoulos to open the cash register. [Trial 6/29/11, p 263]. In reciting what happened next, Mr. Anagnostopoulos began to

---

[1] The witness testified that the shop was also known as Wholesale 2 U. Despite having a reputation otherwise, Mr. Anagnostopoulos was adamant that his store was not at all functioning as a pawn shop. [Trial 6/29/11 245].

testify not based on his knowledge or memory, but by narrating the contents of the surveillance video in response to questions asked by the prosecutor. [Trial 6/30/11, p 5-8].

Mr. Anagnostopoulos noted that Mr. Henderson took him to an office inside the store and ordered him to open up the safe. Mr. Henderson was calling Mr. Anagnostopoulos racial slurs and threatening to shoot and kill him, and then hit him with the gun again on the side of his face.[2] [Trial 6/30/11, p 9, 14-15]. Mr. Henderson directed Mr. Anagnostopoulos to hand him everything from inside the safe, including a gun he kept there. [Trial 6/30/11, p 23]. Some of the other stolen goods included paper money, gold coins, silver dollars, silver certificates, foreign currency, three Rolex watches, and a gold Fossil watch. [6/30/11 Trial, p 39-44].

Mr. Henderson and Mr. Gibbs ultimately left the store and Mr. Anagnostopoulos, his wife, and Mr. Kassing followed to determine where the two men went. [Trial 6/30/11, p 27-29]. The police called and eventually arrived on the scene in response to receiving a silent panic alert from inside the store from Mr. Kassing. [Trial 6/30/11, p 29-31].

Mr. Anagnostopoulos was able to pick out Mr. Gibbs in a subsequent corporeal line-up, but could not identify Mr. Henderson.[3] [Trial 6/30/11, p 32-35]. According to him, his watches and Visa debit card was recovered, but several items taken during the robbery were never returned to him. [Trial 6/30/11, p 34-37].

**Nancy Anagnostopoulos** was a joint owner of the Wholesale 4 U business with her husband Costas. [Trial 6/29/11, p 8-9]. She arrived at the store around 5:25 p.m. on the day of the robbery, thirty minutes before closing. Her husband and Jeremy Kassing were present, and she sat down and down began reading a book [Trial 6/29/11, p 41-42]. Like her husband, Mrs.

---

[2] Part of Mr. Anagnostopoulos' ear was cut from being hit with the gun, requiring four stitches. He also claimed to have more frequent headaches as a result. [Trial 6/30/11, p 45-46].

[3] Mr. Anagnostopoulos was able to identify both men at trial. [Trial 6/29/11, p 251-252].

Anagnostopoulos recounted what happened next by walking the prosecutor and jury through the contents of the video, rather than testifying from her memory.

As her husband and Mr. Kassing worked to troubleshoot the video game, Mrs. Anagnostopoulos heard a loud crack. She stood up and saw her husband going down on the floor, and Mr. Gibbs approached her. He jerked the necklaces from her neck and tried to remove Mrs. Anagnostopoulos' ring from her finger.[4] When he could not remove the ring himself, he directed Mrs. Anagnostopoulos to either do so, or risk him cutting it off. Mr. Gibbs reached into all of Mrs. Anagnostopoulos' pockets and took her identification, ATM card, concealed pistol license, and money. [Trial 6/29/11, p 62-65, 94]. Mr. Henderson later double checked Mr. Gibbs' work in this regard. [Trial 16/29/11, p 117]. Mr. Gibbs never had possession of a gun, knife, or any other weapon and never threatened to beat, stab, shoot, or otherwise injure her, her husband, or Mr. Kassing. [Trial 6/29/11, p 106-110].

Mrs. Anagnostopoulos could see the gun in Mr. Henderson's hand, and heard him yelling racial slurs and threats at her husband. [Trial 6/29/11, p 66-67, 121-124]. When Henderson led Mr. Anagnostopoulos into the back room, Mr. Gibbs began removing money from the cash register. He also took an iPod, and according to Mrs. Anagnostopoulos, Mr. Gibbs retrieved several laptops from the showcase because Mr. Henderson had instructed him to do so. Mr. Gibbs was hesitant to go behind the showcase to obtain more merchandise, so Mrs. Anagnostopoulos volunteered to do so for him. [Trial 6/29/11, p 67-70]. Mr. Gibbs did not say much else to her, but he yelled to Mr. Henderson to "come on" and that they had three minutes. [Trial 6/29/11, p 71-72]. At that point (but only after double-checking whether Mr. Gibbs properly emptied the register), Mr. Henderson picked up a duffle bag, threw it at Mr. Gibbs, and

---

[4] Mrs. Anagnostopoulos claimed to suffer whiplash from the snatching incident. [Trial 6/29/11, p 94].

yelled at him to put the laptops inside. [Trial 6/29/11, p 67, 73-74]. Mr. Gibbs "just did it," according to Mrs. Anagnostopoulos. Mr. Henderson then directed Mr. Gibbs to wait before leaving, as they couldn't exit with the items so conspicuously.[5] Mr. Henderson then emptied Mrs. Anagnostopoulos' purse. [Trial 6/29/11, p 74]. The two men left and Mrs. Anagnostopoulos, her husband and Mr. Kassing conveyed information about the event to the police. [Trial 6/29/11, p 85, 89-93]. In separate live-lineups conducted later, Mrs. Anagnostopoulos selected Mr. Gibbs and Mr. Henderson as her assailants. [Trial 6/29/11, p 99-104]. She also identified the men in court.

**Jeremy Kassing** added that the store had a hand-held silent panic alarm system, and he pressed the device nine times during the robbery to alert the police. [Trial 6/30/11, p 78-79]. Mr. Kassing identified Mr. Gibbs as one of his assailants both during a lineup and at trial. [Trial 6/30/11, p 79-80, 101-103]. Like the other two witnesses, Mr. Kassing confirmed that only Mr. Henderson had a gun during the incident. Additionally, it was only Mr. Henderson who demanded that Mr. Kassing empty his pockets. [Trial 6/30/11, p 81-82, 97]. Mr. Kassing perceived Mr. Henderson as the leader of the robbery, inasmuch as he was telling Mr. Gibbs what to do. [Trial 6/30/11, p 115-116].

**Officer Michael Ross** of the Flint Police Department responded to the radio dispatch regarding the incident. [Trial 6/29/11, p 149, 151]. He took descriptions of the suspects, watched a portion of the surveillance video, and looked for potential fingerprints that could be lifted from the scene. [Trial 6/26/11, p 154-155, 157-159].

After speaking with Officer Ross and watching the surveillance video, **Michele Champion** (then an identification technician for the Flint Police Department), processed a video

---

[5] Jeremy Kassing recalled this sequence of events similarly, noting that Mr. Henderson told Mr. Gibbs he couldn't look so suspicious, and then went back and found another bag. [Trial 6/30/11, p 93].

game, a countertop, the safe, and a glass display cases inside the shop in an effort to locate fingerprints [Trial 6/29/11, p 183, 187-190, 206-207]. She then submitted the prints for further identification through the Automated Fingerprint Identification System (AFIS), a national database. [Trial 6/29/11, p 197-198]. **Mary Martin**, an AFIS employee and sworn expert in fingerprint identification and comparison, then testified that one of the prints recovered matched Mr. Gibbs' left ring finger, while another matched Mr. Henderson's left ring finger. She also determined that one of the prints belonged to Costas Anagnostopoulos. [Trial 6/29/11, p 230-233]. **Phillip Thick**, another AFIS employee and fingerprint expert, added that a separate print recovered from the scene matched Mr. Gibbs' left thumb. [Trial 7/6/11, p 8, 16, 23-24].

**Sergeant Shawn Ellis** testified as the officer in charge of the investigation. [Trial 6/30/11, p 143]. After receiving the AFIS report, Sergeant Ellis followed-up with Mr. Gibbs, who turned himself in. He obtained consent from Mr. Gibbs' mother to search her house, and there the officer recovered, *inter alia*, (1) a Ziploc bag with miscellaneous jewelry, (2) a Sam's Club card bearing Nancy Anagnostopoulos' name and picture, (3) three Rolexes and a Fossil watch, and (4) coins and foreign currency. [Trial 6/30/11, p 152-153, 156-161].

Sergeant Ellis obtained a statement from Mr. Gibbs after he voluntarily surrendered. He claimed that Mr. Gibbs waived his *Miranda* rights and that the statement was recorded, although he was unable to produce the recording at the time of trial. [Trial 6/30/11, p 203, 211-212]. According to Sergeant Ellis, Mr. Gibbs said he and Mr. Henderson went to the pawn shop to try and sell some jewelry. They were trying to raise money to buy marijuana, but were told the jewelry was fake. [Trial 6/30/11, p 212]. Mr. Henderson then bought a video game for them to play and the two men left the store. [Trial 7/6/11, p 34]. Henderson changed his mind and decided to return the game, and Mr. Gibbs accompanied him back to the pawn shop. Mr. Gibbs

did not know that Henderson was going to rob the place, but once inside, Henderson pulled out the handgun, hit the store owner with it, and ordered Mr. Gibbs to take Mrs. Anagnostopoulos' cell phone and jewelry along with laptops and other items. [Trial 7/6/11, p 34-35]. Mr. Gibbs noted that Mrs. Anagnostopoulos offered to help him and ultimately did so. He acknowledged carrying away items from the store and said they drove around for thirty minutes and eventually ended up at Mr. Gibbs' house. Mr. Henderson said he would pay Mr. Gibbs $100 to keep the items, but Mr. Gibbs was never paid and Mr. Henderson never came back to pick up anything he had left. Amongst the items police recovered from Mr. Gibbs was a Pittsburgh Pirates hat that he said belonged to Mr. Henderson. [Trial 7/6/11, p 36-37].

Lastly, **Phillip Gibbs** testified in his own defense. He was sixteen years old on the day of the robbery. [Trial 7/6/11, p 87-88]. He acknowledged being in the store earlier in the day in an effort to sell Mr. Henderson's jewelry in exchange for money for marijuana. [Trial 7/6/11, p 90-91]. After learning that the jewelry had no value, he informed Mr. Henderson of that and the two men returned to the store to buy a video game instead. Mr. Gibbs went back to the store a third time with Henderson, who intended to seek a refund. As Mr. Anagnostopoulos and Mr. Kassing plugged up the video game for testing, Mr. Gibbs heard a smacking / clapping noise and saw Mr. Anagnostopoulos falling to the floor. [Trial 7/6/11, p 91-94]. Mr. Gibbs then saw Mr. Henderson with a large gun in his hand, and was startled when he realized Henderson had hit Mr. Anagnostopoulos with the gun. [Trial 7/6/11, p 95]. Mr. Gibbs knew what Mr. Henderson was doing was wrong, but he complied with his orders to retrieve items from Nancy. This was because he was hoping not to be injured himself, as he was afraid of Mr. Henderson's gun. [Trial 7/6/11, p 96]. Accordingly, he took the money from the cash register and complied with the order to take the laptops from the showcase even though he really wanted no part of the

robbery. Although Mr. Gibbs did not run when Mr. Henderson was out of sight, he was thinking to himself that he hoped Mr. Henderson would not hurt anybody. [Trial 7/6/11, p 97-101]. Mr. Henderson emerged from the back and checked the cash register again, then threw a duffle bag on the floor with directions for Mr. Gibbs to fill it with laptops. Moreover, he called Mr. Gibbs dumb or stupid for leaving the store with the items exposed, and retrieved Mrs. Anagnostopoulos' purse to carry the gun and some of the laptops. [Trial 7/6/11, p 101-103]. Consistent with his police statement, Mr. Gibbs indicated that he was taken home and agreed to hide the goods at his house after being pressured by Mr. Henderson. [Trial 7/6/11, p 106-107].

<u>Verdict and sentence</u>

Ultimately, a Genesee County jury refused to hold Mr. Gibbs accountable for the weapon Mr. Henderson used to effectuate the crime. Nevertheless, Mr. Gibbs was still convicted of two counts of armed robbery,[6] one count of unarmed robbery,[7] and one count of conspiracy to commit armed robbery[8] [Trial 7/7/11, p 59-60].

At sentencing, trial counsel agreed to the scoring of the prior record variables, but challenged the points assessed against Mr. Gibbs for OV 4 and OV 13. [Sentence 8/15/11, p 9-18]. Notwithstanding his relatively lesser culpability, minimal past, and youthful status, Judge Fullerton ordered Mr. Gibbs to serve concurrent sentences at the very top of his guidelines of (1) 17.5 years to 30 years imprisonment for the armed robbery and conspiracy charges, and (2) 100 months to 15 years imprisonment for the unarmed robbery charge. [Sentence 8/15/11, p 25-26].

---

[6] MCL 750.529.

[7] MCL 750.530.

[8] 750.157a.

7

## Appellate proceedings

Mr. Gibbs appealed as of right to the Court of Appeals under MCR 7.203(A)(1), with SADO raising three issues: (1) the trial court violated Mr. Gibbs' Sixth Amendment right to a public trial by closing the courtroom and excluding members of his family from jury selection; (2) Mr. Gibbs' Fifth Amendment right to remain silent was violated when the prosecutor used his pre-arrest silence to impeach his exculpatory testimony at trial, and the prosecutor then referred to the silence during closing argument; and (3) because the court below made mistakes in scoring PRV 5, PRV 6, and OV 13, Mr. Gibbs must be resentenced (5/23/2012 Brief on Appeal, p 8-24).

SADO also filed a timely motion to remand on issues 1 and 3 (see Appendix 1). On issue 1, SADO submitted affidavits from family members Elverta Gibbs, Courtney Jones, and Seandra Davidson-Coleman (no relation to appellate counsel) establishing the trial court's apparent policy of excluding family members during jury selection (see Appendix 2, previously submitted with the motion). The Court of Appeals granted the motion, and directed, among other things, that the trial court "conduct an evidentiary hearing on the closure of the courtroom during voir dire" (see order, Appendix 3). SADO filed a motion for new trial or resentencing (see lower court file).

On remand, the trial court acknowledged that indeed, once jury selection begins, it is her policy to not allow any persons to enter or leave the courtroom. [Hearing 7/16/12, p 6; see Appendix 4]. She disclaimed any duty on her part to "troll in the halls for spectators," or go out "and lasso [people] with a rope" to bring them in, but reaffirmed that "if someone comes after we've started selecting the jury, they will not be allowed in, that's absolutely right." [Hearing 7/16/12, p 7, 9]. In her judgment, "If that's a violation, then [she] violated." [Hearing 7/16/12, p 8]. The trial court declined to hold the evidentiary hearing [Hearing 7/16/12, p 14-15].

As to the motion for resentencing, the prosecutor tendered no evidence to substantiate the claim that Mr. Gibbs was on bond for a juvenile misdemeanor when he committed the sentencing offenses. The prosecutor instead rested on legal arguments and noted that resentencing would not be required if the court were inclined to give the same sentence. [Hearing 7/16/12, p 17]. Nevertheless, the trial court found that as to PRV 6, Mr. Gibbs was "obviously related" to the criminal justice system between the date of his guilty plea and the acquisition of new charges. [Hearing 7/16/12, p 18]. She also concluded that, in her judgment, PRV 5 was correctly scored for the prior misdemeanor conviction, though she did not articulate a reason underlying this conclusion. The trial court entered an order denying a new trial or resentencing (7/16/2012 Order, Appendix 5).

The Court of Appeals thereafter issued a published opinion (Appendix 6) affirming Mr. Gibbs' convictions and sentence; though agreeing that the trial court erred in scoring two points for PRV 5.

Mr. Gibbs applies for leave to appeal his convictions; and the scoring of PRV 6 and OV 13.

### I. THE TRIAL COURT VIOLATED MR. GIBBS' SIXTH AMENDMENT RIGHT TO A PUBLIC TRIAL BY CLOSING THE COURTROOM AND EXCLUDING MEMBERS OF HIS FAMILY FROM JURY SELECTION.

*Issue Preservation and Standard of Review.* Trial counsel did not object to the closing of the courtroom during *voir dire.* Accordingly, the plain error standard of review applies. See *People v Carines,* 460 Mich 750, 763; 597 NW2d 130 (1999). However, in *United States v Gupta,* 699 F3d 682 (CA 2, 2012), the Second Circuit held that the defendant did not forfeit his courtroom closure claim where it did not appear defense trial counsel was aware of the closure at the time it happened, and the record was "at best undeveloped." *Id,* p 689-690.

Since this issue implicates Mr. Gibbs's Sixth Amendment right to a public trial, this Court reviews the claim *de novo. People v Dendel,* 481 Mich 114; 748 NW2d 859 (2008).

*Argument.* The Sixth Amendment directs that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy *and public trial. . . .*" US Const; Am VI (emphasis added). This right applies to state prosecutions under the Fourteenth Amendment. *In re Oliver,* 333 US 257, 273; 68 S Ct 499; 92 L Ed 682 (1948). The policy considerations underlying the right to a public trial are compelling: "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions. . . ." *Waller v Georgia,* 467 US 39, 46; 104 S Ct 2210; 81 L Ed 2d 31 (1984) (quoting *In re Oliver, supra* at 270, n 25).

In a *per curiam* decision, the United States Supreme Court noted unequivocally that the right to an open courtroom applies to the jury selection phase of the trial and, in particular, the examination of prospective jurors. *Presley v Georgia,* 558 US 209; 130 S Ct 721, 725; 175 L Ed 2d 675 (2010). This holding does not create a new right; it simply re-affirms what the Court

10

recognized 28 years ago in *Waller v Georgia, supra.*[9] The beneficiary of the right to a public trial is both the accused and the public-at-large. The right is grounded in the Sixth Amendment, *Gannett Co v DePasquale,* 443 US 368, 380; 99 S Ct 2898; 61 L Ed 2d 608 (1979), as well as the First Amendment. *See Press-Enterprise Co v Superior Court,* 478 US 1; 106 S Ct 2735; 92 L Ed 2d 1 (1986).

*Presley* reminds us that the selection of a jury is itself a matter of importance, "not simply to the adversaries, but to the criminal justice system." *Presley, supra* at 724-25 (quoting *Press-Enterprise Co, supra* at 505.) The *Presley* majority used strong language, declaring that under the Court's "clear precedents," it was "so well settled that the Sixth Amendment right extends to jury voir dire that this Court may proceed by summary disposition." *Id.* at 722–24. The tenor of the opinion demonstrates the Court's frustration with repeated failures to abide by its holdings.

*Presley* reemphasized that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials," including at jury selection. *Id.* at 724. What is obvious from the Court's discussion is that the first and foremost "obligation" is the duty to ensure the courtroom is open and not unduly restricted by staff or court officers. Furthermore, given the purposes of the public trial right articulated in *Waller,* it follows that the "integrity and public reputation of the judicial proceedings" is damaged when jury selection is closed to the public.

Even where the trial judge does not clear the courtroom, the declaration of a court officer is chargeable to the trial court. See, e.g., *Commonwealth v Alebord,* 953 NE2d 744, 747 (Mass App 2011) ("There can be no doubt that, unless the court officer's action [closing the courtroom

---

[9] Among the values furthered by the public trial guarantee are: (1) to ensure a fair trial; (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury. *Waller, supra* at 46-47.

for jury selection] was within some independent exception, the courtroom in this case was "closed" in the constitutional sense. The fact that a court officer, not the judge, prevented the defendant's friend and relatives from entering the courtroom during jury selection does not alter this").

In *People v Vaughn*, 491 Mich 642; 821 NW2d 288 (2012), this Court held that where defense trial counsel is aware of courtroom closure at the time of voir dire and fails to object, the defendant forfeits the issue, subject only to plain error review, with a heavy burden on the defendant to overcome the presumption that the error did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings" where "the closure of the courtroom was limited to a vigorous voir dire process that ultimately yielded a jury that satisfied both parties." *Id*, p 668-669.

In the present case, the trial court mentioned at the commencement of jury selection "if any spectators would like to come in they're welcome,"[10] yet affidavits submitted by several members of Defendant-Appellant's family in support of the motion to remand suggest that court personnel told them exactly the opposite. Mr. Gibbs' mother, sister, and brother-in-law all attested that they, members of the co-Defendant's family, and other members of the public were prevented from entering the courtroom during jury selection (see affidavits, Appendix 2).

On remand, the trial court acknowledged that indeed, once jury selection begins, it is her policy to not allow any persons to enter or leave the courtroom. [Hearing 7/16/12, p 6; see Appendix 4]. She disclaimed any duty on her part to "troll in the halls for spectators," or go out "and lasso [people] with a rope" to bring them in, but reaffirmed that "if someone comes after we've started selecting the jury, they will not be allowed in, that's absolutely right." [Hearing 7/16/12, p 7, 9].

---

[10] [Trial 6/28/11, p 4].

However, notwithstanding the Court of Appeals remand order (Appendix 3) directing that "the trial court shall conduct an evidentiary hearing based on the closure" the trial court declined to do so [Hearing 7/16/12, p 14-15]. As a result, SADO could not develop a record as to whether (1) defense trial counsel even knew at the time that court personnel had excluded Mr. Gibbs' family from jury selection, thereby triggering plain error review instead of automatic reversal; and (2) court personnel merely acted as gatekeepers to prevent disruptions during jury selection, or went further and violated *Presley* by actually preventing spectators from entering the courtroom even before the commencement of the proceeding.

Furthermore, as a matter of law reform, Appellant maintains that this Court reached the wrong result in *People v Vaughn, supra.* In *Presley*, the United States Supreme Court observed: "The public has a right to be present *whether or not any party has asserted the right.*" *Presley, supra* at 724-25 (emphasis added). This language places the responsibility for ensuring the right to a public trial firmly at the feet of the trial judge, not the defendant. For example, in *Salem v Jenkins,* 414 F Supp 2d 687, 696 (ED Mich, 2006) the district court held that "the Michigan Court of Appeals' decision that counsel failed to preserve this issue was based on the incorrect belief that *Waller* required Petitioner's attorney to advance specific objections." To the contrary, it is not necessarily incumbent upon the defendant to contest a closed courtroom; rather, it is the onus of the trial court to ensure the public is granted access to a trial, thus preserving not only the defendant's right, but also the rights of the public-at-large. *Presley, supra* at 721; see also *State v Njonge,* 255 P3d 753, 756 (Wash App, 2011).

For these reasons, due process requires a new trial, or at least another remand to the trial court to hold a full evidentiary hearing.

II.    **MR. GIBBS' FIFTH AMENDMENT RIGHT TO REMAIN SILENT WAS VIOLATED WHEN THE PROSECUTOR USED HIS PRE-ARREST SILENCE TO IMPEACH HIS EXCULPATORY TESTIMONY AT TRIAL, AND THE PROSECUTOR THEN REFERRED TO THE SILENCE DURING CLOSING ARGUMENT.**

*Issue Preservation and Standard of Review.* The *de novo* standard of review applies to claims of constitutional error. *People v McPherson,* 263 Mich App 124, 131; 687 NW2d 370 (2004). Trial counsel did not object, so a plain error analysis must be applied. *People v Carines, supra.*

*Argument.* US Const, Am V, provides, in pertinent part: "No person … shall be compelled in any criminal case to be a witness against himself." This constitutional protection applies, through the Due Process Clause of US Const, Am XIV, to state prosecutions. See, e.g., *Griffin v California*, 380 US 609; 85 S Ct 1229; 14 L Ed 2d 106 (1965) (prohibiting comment by the prosecutor about a defendant's refusal to testify at trial or a jury instruction that such silence is evidence of guilt).

While noting a split of authority, the Sixth Circuit has held that the Fifth Amendment also forbids a prosecutor from commenting on a defendant's pre-arrest silence as substantive evidence of guilt:

> We agree with the reasoning expressed in the opinions of the Seventh, First, and Tenth Circuits, and today we join those circuits in holding that the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination. Like those circuits, we believe that application of the privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime. . . . In a prearrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments could provide damaging evidence that might be used in a criminal prosecution; the privilege should thus apply [*Combs v Coyle*, 205 F3d 269, 283 (CA 6, 2000); internal quotation marks and citation omitted].

14

The Sixth Circuit reasoned that "permitting the use of silence in the government's case in chief would substantially impair the policies behind the privilege." *Id*, p 285. Observing "there are many reasons why a defendant may remain silent before arrest," the Sixth Circuit also concluded that "the government's use of a defendant's prearrest silence in its case in chief is not a legitimate governmental practice." *Id*; see also *Girts v Yanai*, 501 F3d 743, 750, 755-756 (CA 6, 2007) (granting Federal habeas relief in a murder case, and observing: "When confronted with evidence that he had obtained cyanide, defendant told the police that he had used the cyanide to control groundhogs on the property. . . . The prosecutor also stated that 'with respect to the source [of the cyanide] the defendant had no less than three occasions to tell the police that he had ordered the cyanide.' . . . The prosecutor's . . . statement[] w[as] improper, misleading and highly prejudicial because [it] implied that Petitioner was obligated to . . . speak to the police"); contra, *People v Collier*, 426 Mich 23; 393 NW2d 346 (1986); *People v Solmonson*, 261 Mich App 657, 664-665; 683 NW2d 761 (2004).[11]

In the present case, the prosecutor elicited Mr. Gibbs' prearrest silence and asked him to account for his conduct immediately after the crime:

> *Q (by prosecutor)*: So, when did you tell your Mom about what happened at the shop?
>
> *A.* I didn't – I didn't tell her.
>
> *Q.* When do you tell – when do you go to the police to tell them that Tyrell Henderson made you rob the Wholesale 4 U pawnshop on Davidson Road in the city of Flint?
>
> *A.* What you mean by when?  Like what day?

---

[11] The United States Supreme Court has agreed to decide whether the Fifth Amendment protects a defendant from introduction of pre-arrest, pre-*Miranda* refusal to answer law enforcement questions. *Salinas v State*, 369 SW3d 176 (Tex Crim App, 2012), cert gtd ___ US ___; 133 S Ct 928; 184 L Ed 2d 719 (2013).

*Q.* When?  When do you go to the police and say, police, [a] friend of mine just made me help him rob a store?

*A.* November 1st.

*Q.* And, you go on November 1st 'cause you know the police are looking for you; right?

*A.* [T]hat's not the only reason why I went. 'Cause I had –

*Q.* So, October – October 26 at 6:00, just after this robbery is completed, if we watched the clock on the videotape?  When do you call nine-one-one to tell 'em what happened?

*A.* I didn't call nine-one-one [Trial 7/6/11, p 128-129].

Although the *Collier* court found no impropriety with similar impeachment by the prosecutor under the circumstances presented there, this was largely because that defendant claimed self-defense. The *Collier* court opined that it would have been "natural" for Collier to contact the police given the nature of his theory, inasmuch as "one who has been robbed under the circumstances related by the defendant would report the crime to the police. Defendant knew the identity of the robber and the location of the robbery. It would have been natural for him to report the crime to the police, to have the assailant arrested, and to retrieve his property." *Collier* at 34–36. Here however, it would not at all have been natural for Mr. Gibbs to contact the police or disclose the crime to his mother or anyone else afterwards, given his claim that he committed the crime under duress. The same threat of harm that caused him to remain on the scene would have endured, if not grown, once the crime was complete; at that point, Mr. Gibbs was the only other person who could implicate Mr. Henderson fully in the robbery.  Because approaching the police may have resulted in Mr. Gibbs incriminating, or worse, harming himself, it was improper for the prosecution to comment on Mr. Gibbs' failure to come forward sooner than he did.

Nevertheless, the prosecutor chose to revisit this theme during closing argument:

16

> Because remember despite what Phillip Gibbs testified to here in the courtroom about what his knowledge was, what his role or lack thereof was, he doesn't take an opportunity to run out of the store. He doesn't call 911 from inside the store. He doesn't run away separate from Mr. Henderson after this robbery occurred. He doesn't tell his mother. He doesn't go to the police. Think of that when you evaluate his testimony [Trial 7/6/11, p 182].

The prosecutor's argument was highly prejudicial and impermissibly undermined Mr. Gibbs' constitutional right to remain silent. The prosecutor attempted to use Mr. Gibbs' silence to cast suspicion on his exculpatory testimony by eliciting the inference that if Mr. Gibbs had truly been innocent of armed robbery, he would have offered his exculpatory explanation the night he was arrested. The prosecutor's argument ignored the fact that Mr. Gibbs had the right to remain silent and had a valid reason to exercise that right.

Allowing the use of Mr. Gibbs' silence for impeachment turned his constitutional protections against him by punishing him for not immediately waiving his Fifth Amendment rights by incriminating himself in order to escape liability for the robbery allegations. By highlighting Mr. Gibbs' reliance on the right to remain silent, the prosecutor planted a prejudicial inference in the mind of the jury while obscuring the legitimate reasons for not speaking to the police. Because this flies in the face of his right to silence, this Court should grant Mr. Gibbs a new trial.

III.   **BECAUSE THE COURT BELOW MADE THREE GUIDELINES-SCORING MISTAKES, AND CORRECTING THE MISTAKES WOULD SUBSTANTIALLY REDUCE THE GUIDELINES RANGE, MR. GIBBS MUST BE RESENTENCED.**

*Issue Preservation and Standard of Review.* Defense trial counsel objected at sentencing to the scoring of OV 13 (Sentence 8/15/11, p 15-17). SADO thereafter filed a timely motion to remand to preserve Appellant's objection to the scoring of PRV 5 and PRV 6 (see motion, ¶ 2; Appendix 1). The Court of Appeals granted the motion (Appendix 3). SADO thereafter filed a motion for resentencing (see lower court file) and the trial court overruled appellate defense counsel's objection (T 7/16/2012 18-19; see Appendix 4; 7/16/2012 Order, Appendix 5).

The Court of Appeals agreed that the trial court should not have scored two points under PRV 5; but disagreed that the trial court erred in scoring PRV 6 and OV 13 (see slip op, p 6-7; Appendix 6).

The proper interpretation and application of the statutory sentencing guidelines are legal questions that Michigan appellate courts review *de novo. People v Morson,* 471 Mich 248, 255; 685 NW2d 203 (2004).

*Argument.* Under the Michigan and United States Constitutions, defendants have a due process right to be sentenced on the basis of accurate information and in accordance with the law. *Townsend v Burke,* 334 US 736; 68 S Ct 1252; 92 L Ed 1690 (1948); *People v Lee,* 391 Mich 618, 636-637; 218 NW2d 655 (1974); *People v Malkowski,* 385 Mich 244; 188 NW2d 559 (1971). This Court has found that "it is difficult to imagine something 'more inconsistent with substantial justice' than requiring a defendant to serve a sentence that is based upon inaccurate information." *People v Francisco,* 474 Mich 82, 91, n 6; 711 NW2d 44 (2006). Thus, a defendant is entitled to resentencing when his sentence is predicated upon mis-scored and inflated guidelines. *Id.* at 91-92.

PRV 6

Mr. Gibbs received a 5-point score under PRV 6 for being "on probation or delayed sentence status or on bond awaiting adjudication or sentencing for a misdemeanor." MCL 777.56(1)(d). Yet, this score was both factually and legally inappropriate. Factually speaking, there was no record evidence of Mr. Gibbs ever being placed on bond when he acquired the entering without permission charge as a juvenile. A few months before committing the sentencing offense, the then-sixteen-year-old defendant was adjudicated responsible (by virtue of a plea) for entering without permission in the Genesee County Probate Court (PSR 3). He did not receive a juvenile disposition for this offense until after the current crimes had been committed. When that disposition took effect, however, he was placed on a probationary term that was ultimately suspended in light of the charges in the current case. Even if he had been on bond, however, the plain language of the legislative sentencing guidelines under PRV 6 makes it apparent that points cannot be assessed for a defendant's relationship with the juvenile justice system. Resentencing is thus warranted.

A five-point score under PRV 6 is reserved for offenders who already have a "relationship to the criminal justice system" when the crime is committed. MCL 777.56(1). Unlike the judicial guidelines, the Legislature's version of PRV 6 does not assign points based on a defendant's status within the juvenile justice system. To the extent that our Court of Appeals recently held to the contrary in *People v Anderson*, 298 Mich App 178; 825 NW2d 678 (2012) (juvenile probation scores under PRV 6), this Court should overrule that opinion, for the reasons argued below.

Whether a relationship to the juvenile justice system may be used to score PRV 6 is a question of statutory construction. When interpreting statutes, this Court must give effect to the intent of the Legislature by applying the provision's plain language. *People v Koonce,* 466 Mich 515, 518; 648 NW2d 153 (2002). This Court considers both the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme. *US Fidelity Insurance & Guaranty Co. v Michigan Catastrophic Claims Ass'n (On Rehearing),* 484 Mich 1, 13; 795 NW2d 101 (2009). Whenever possible, the Court should give effect to every phrase, clause and word in a statute. *Id.* Omitted phrases may also be significant, as "[t]he Legislature is presumed to be familiar with the rules of statutory construction and, when promulgating new laws, to be aware of the consequences of its use or omission of statutory language[.]" *Tellin ex rel Hinga v Forsyth Twp,* 291 Mich App 692; 806 NW2d 359 (2011), quoting *In re MKK,* 286 Mich App 546, 556; 781 NW2d 132 (2009).

Critically, the Legislature made no reference to juvenile delinquency proceedings when it enacted MCL 777.56, the statute which created the current version of PRV 6. The variable examines whether the offender had a "relationship to the ***criminal justice system***" at the time of the sentencing offense. MCL 777.56(1) (emphasis added). Such a score is appropriate only if the "[o]ffender is on probation or delayed sentence status or on bond awaiting adjudication or sentencing for a misdemeanor." MCL 777.56(1)(d). As noted, zero points must be assessed if the "[o]ffender has ***no relationship to the criminal justice system.***" MCL 777.56(1)(e) (emphasis added). *See also People v Johnson,* 293 Mich App 79; 808 NW2d 815 (2011).

The Legislature's repeated use of the phrase "criminal justice system" makes clear it did not intend PRV 6 to encompass juvenile matters. Through various enactments, the Legislature has established a clear distinction between criminal cases and delinquency proceedings. The

20

procedures governing the latter are codified not in the Penal Code, but instead in the Probate Code at MCL 712A.1 *et seq.* See also Const 1963, Art 6, § 15 (providing that the probate court "shall have original jurisdiction in all cases of juvenile delinquents and dependents, except as otherwise provided by law"). By statute, delinquency "proceedings under this chapter *are not criminal proceedings*" unless otherwise provided." MCL 712A.1(2) (emphasis added).

This distinction is found elsewhere in the guidelines as well. PRV 1 and PRV 2, for example, weigh "convictions" for certain "crimes." MCL 777.51, 777.52. In contrast, PRV 3 and PRV 4 consider only "a juvenile adjudication for conduct that would be . . . [a crime] if committed by an adult[.]" MCL 777.53, 777.54. Similarly, PRV 5 refers to "a juvenile adjudication for conduct that if committed by an adult would be a misdemeanor." MCL 777.55(3)(b). As these provisions recognize, a juvenile is not adjudicated guilty of a "crime"; rather, a juvenile can only be adjudicated guilty of what "would be" a crime if committed by someone older. The guidelines therefore acknowledge what the Probate Code already confirms: "proceedings under this chapter *are not criminal proceedings*" unless otherwise provided." MCL 712A.1(2) (emphasis added).

Certainly, if the Legislature had intended for PRV 6 to apply to a defendant's relationship with the juvenile justice system, it could have said so. After all, PRV 3, PRV 4, and PRV 5 all expressly provide for the consideration of delinquency adjudications. In contrast, while the word "adjudication" does appear in the text of PRV 6, it is not used in the context of delinquency proceedings. Nor is it used to refer to juvenile bond status. Rather, it appears within the phrase "on bond awaiting adjudication or sentencing for a misdemeanor." MCL 777.56(1)(d). In this context, "adjudication" means simply: "The legal process of resolving a dispute; the process of judicially deciding a case." Black's Law Dictionary (9th ed), p. 42. It follows, therefore, that

this clause of PRV 6 is only concerned with sentencing offenses that occur before the final resolution of an adult misdemeanor charge.  After all, as discussed above, PRV 6 refers to defendants charged with a "misdemeanor," not defendants charged with "conduct that if committed by an adult would be a misdemeanor."  *Compare* MCL 777.55(3)(b) *with* MCL 777.56(3)(b).

Language referencing juvenile matters could have been added to PRV 6 with little difficulty.  Given what is expressed in PRV 3, PRV 4, and PRV 5, it must be presumed that the Legislature intentionally omitted such language when it drafted PRV 6.  This is consistent with the well-established legal maxim *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of another").  *Miller v Allstate Ins Co,* 481 Mich 601, 611; 751 NW2d 463 (2008).  The maxim is a rule of construction that is a product of "logic and common sense."  *Feld v Robert & Charles Beauty Salon,* 435 Mich 352, 362; 459 NW2d 279 (1990) (quoting 2A Sands, Sutherland Statutory Construction (4th ed), § 47.24, p 203).  This Court has long held that "no maxim is more uniformly used to properly construe statutes."  *Hoerstman General Contracting, Inc v Hahn,* 474 Mich 66, 74–75; 711 NW2d 340 (2006), citing *Taylor v Michigan Public Utilities Comm,* 217 Mich 400, 403; 186 NW 485 (1922).

Further evidence of the Legislature's intent can be found by comparing PRV 6 to its predecessor under the judicial guidelines.  The instructions to the predecessor variable expressly provided that "a 'relationship to the criminal justice system' *applies to relationships determined by juvenile convictions or charges.*"  *Id. People v Stone,* 195 Mich App 600, 607-608; 491 NW2d 628 (1992) (emphasis added) (quoting the version of PRV 6 which appeared in the judicial sentencing guidelines).

Thus, it must be presumed: (1) that the Legislature was aware of the prior version of PRV 6 when it enacted the current version; and (2) that the differences between the two variables were intended. *See People v Hegwood,* 465 Mich 432, 438-439; 636 NW2d 127 (2001) ("At the time it enacted these guidelines, the Legislature opted for a system with many features that were easily recognizable by courts familiar with the format previously employed in Michigan. . . . Yet it is apparent that the Legislature has provided new ground rules.").

For all of these reasons, PRV 6 was not intended to be scored in this case.

<u>OV 13</u>

OV 13 should have been scored at zero points, not 25. Multiple convictions arising from a single incident do not establish a "continuing pattern of criminal behavior." OV 13 was scored 25 points on the theory that the sentencing offense was "part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(b).

The three crimes against a person of which Mr. Gibbs was convicted here were his first felony convictions. He had no other felony record, adult or juvenile. PSR at 3.[12] Because the three felony convictions in the case on appeal all arose from a single incident, they do not show a "pattern of felonious criminal behavior" and thus cannot support the 25-point OV 13 score. *See People v Shane Joseph Smith,* unpublished opinion per curiam of the Court of Appeals, decided February 25, 2003 (Docket No. 229137), slip op, p 6 (see Appendix 7) (concurrent convictions stemming from "one incident" not scoreable under OV 13; "it is repeated felonious conduct that should be considered in scoring this offense variable"; distinguishing *People v Harmon,* 248 Mich App 522, 532; 640 NW2d 314 (2001), as a case in which concurrent convictions arose not

---

[12] SADO has concurrently submitted a copy of Mr. Gibbs' presentence investigation report for confidential review by the Justices.

from single incident but from "separate acts"). As in *Smith*, the three concurrent convictions here all arose from one incident—a single robbery of three different individuals at the same time.

Moreover, this Court's decision in *People v Cannon*, 481 Mich 152; 749 NW2d 257 (2008), reveals *Harmon* to be bad law. In *Harmon*, the defendant argued that one of the prior crimes said to substantiate the OV 13 score should not have been counted because it was of the wrong crime class. *Harmon*, 248 Mich App at 532. The Court of Appeals did not reach the issue because, it held, other convictions of the proper class—defendant's concurrent convictions—provided sufficient support for the score on their own. *Id.* *Harmon* thus appears to suggest that concurrent convictions (at least if not stemming from the same incident as the sentencing offense) might routinely be scored under OV 13 as well as under PRV 7, the variable that explicitly counts "subsequent or concurrent felony convictions," MCL 777.57.

However, in *Cannon*, this Court made clear that interpreting the guidelines-variables statutes requires a different approach than the one taken in *Harmon*. Reviewing courts must keep in mind the "Legislature's focus" expressed by the title and first subsection. *People v Cannon, supra*, p 157 (2008). Those words—the statute's "central subject"—condition what follows. *Id.* Particular provisions of the statute must be read in the context of that central subject. Thus, OV 10 (whose central subject, as expressed in the title and first subsection, is "exploitation of a vulnerable victim"[13]) requires proof of vulnerable-victim exploitation even when considering a provision of the statute ("predatory conduct was involved") that makes no mention of vulnerable victims. *Id.* at 156-59.

---

[13] MCL 777.40.

OV 13 has a central subject that was likewise ignored, improperly, in *Harmon*. The particular statutory subsection at issue both here and in *Harmon* requires proof only of "a *pattern* of felonious criminal activity involving 3 or more crimes against a person"[14]—language that could arguably refer to crimes committed at the same, or nearly the same, time. However, the statute's title and first subsection make clear that the legislative focus is different: identifying, and providing greater punishment for, those whose conduct reflects a "*continuing* pattern of criminal behavior." MCL 777.43(1) (emphasis added). As the Court of Appeals recognized in *Smith, supra*, the modifier "continuing" means that to be scored under OV 13, a "pattern" of criminal acts must be one that reflects "*repeated* felonious conduct." *Smith, supra* (emphasis added). OV 13 should have been scored 0 points, where "no pattern of felonious criminal acts were committed." MCL 777.43(1)(g).

The erroneous scoring of PRV 5, PRV 6, and OV 13 increased Mr. Gibbs' total guidelines range from the correct cell of C-III, to the resulting range of D-IV. The error inflated the guidelines range from 81-135 months to 126-210 months. The trial court then sentenced Mr. Gibbs at the very top of this incorrect range, to a minimum prison term of 17.5 years. Because the error in scoring the guidelines violated Mr. Gibbs' state and federal due process rights to be sentenced accurately and consistently with the law, he is entitled to be resentenced within the correct range. *People v Francisco, supra*, p 89-92.

---

[14] MCL 777.43(1)(b) (emphasis added).

## JUDGMENT APPEALED FROM AND RELIEF SOUGHT

Defendant-Appellant appeals from the February 14, 2013 opinion of the Court of Appeals, affirming his convictions and sentence. Defendant moves this Honorable Court to either grant this application for leave to appeal, or reverse the judgment of the Court of Appeals (except on the scoring of PRV 5) and remand this case to the Genesee County Circuit Court for an evidentiary hearing, a new trial, or resentencing.

Respectfully submitted,

STATE APPELLATE DEFENDER OFFICE

BY: _____
RANDY E. DAVIDSON (P30207)
**Assistant Defender**
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

Date: April 3, 2013

**APPENDIX 1**

STATE OF MICHIGAN

IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

                 Plaintiff-Appellee,

**Court of Appeals No.** 305939

**Lower Court No.** 11-28140FC

-vs-

**PHILLIP CHARLES GIBBS**

                 Defendant-Appellant.

_____/

<u>**MOTION TO REMAND**</u>

      Defendant-Appellant **PHILLIPS CHARLES GIBBS**, through his attorneys, the **STATE APPELLATE DEFENDER OFFICE**, by **BRANDY Y. ROBINSON**, respectfully moves for remand to the trial court, pursuant to MCR 7.211(C)(1)(a), stating:

      1.      Mr. Gibbs seeks remand to make two additional objections to his sentence and to develop his claim that he was denied his right to a public trial. Trial counsel did not raise these issues at trial or sentencing, but guidelines objections may be made for the first time in a motion to remand. MCL 769.34(10); MCR 6.429(C). Alternatively, Mr. Gibbs argues that his trial counsel was ineffective for acquiescing to the trial errors, and for failing to challenge the illegal sentence. *See Brief in Support of Motion to Remand.*

      2.      As to the scoring errors, Mr. Gibbs challenges PRV-5 and PRV-6, based in part upon the attached affidavit of counsel. Trial counsel interposed a timely objection to the scoring of OV-13.

      3.      As to the public trial claim, Mr. Gibbs relies on the attached affidavits of members of his family to challenge (1) the Court's *de facto* policy of excluding members from the public during *voir dire* and (2) counsel's ineffectiveness for failing to ensure that Mr. Gibbs' family and other members of the public were not improperly pushed out of the courtroom.

RECEIVED by Michigan Court of Appeals 5/23/2012 11:07:40 PM

4.       A remand is appropriate because these matters must be first resolved by the trial court

and/or require the development of an additional factual record to enable full appellate review by this

Court.

**WHEREFORE**, Defendant-Appellant respectfully requests that this Honorable Court grant

his Motion to Remand and afford him an opportunity to (1) develop the record by taking testimony and

evidence regarding the closure of the courtroom, (2) examine trial counsel's reasons for failing to object

to this error, and (3) ask the trial court for resentencing on the basis of his improperly scored guidelines

under PRV-5 and PRV-6.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

/s/ Brandy Y. Robinson

BY:  _____

**BRANDY Y. ROBINSON (P66895)**
**Assistant Defender**
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

Date: May 23, 2012

RECEIVED by Michigan Court of Appeals 5/23/2012 11:07:40 PM

**APPENDIX 2**

05/23/2012 13:01 FAX 810732485??          QTFATICC          ☑002

STATE OF MICHIGAN

IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

Plaintiff-Appellee

Court of Appeals No. 306124

Lower Court No. 11-28140FC

~VS~

**PHILLIP CHARLES GIBBS**

Defendant-Appellant.

_____/

### AFFIDAVIT OF COURTNEY JONES

STATE OF MICHIGAN     )
                      ) ss.
COUNTY OF GENESSEE)

Courtney Jones, being duly sworn, hereby deposes and says that:

1. I am the soon-to-be brother in law of Phillip Charles Gibbs, the defendant in the above-mentioned case.

2. I was present on June 28, 2011 in Judge Judith A. Fullerton's courtroom at the Genessee County Circuit Court to attend the trial of Mr. Gibbs and his co-defendant Tyrell Henderson.

3. I was told by a male official in Judge Fullerton's courtroom that since a jury was being picked, I could not enter and watch the proceedings. The sole reason given was that jury selection was in progress.

4. Upon leaving I sat on a bench that was located outside the courtroom and watched as some of the jurors left the courtroom.

5. Present with me were Seandra Davidson-Coleman and my mother-in-law Elverta Theresa Gibbs.

6. The above information is true to the best of my knowledge and belief.

7. I would swear to these facts if called to testify at a hearing.

Courtney Jones
**Courtney Jones**

Subscribed and sworn to before me
May 21, 2012

Lisa Ann Lamarre
Notary Public, Wayne County, Michigan
My commission expires: 6/6/2018

RECEIVED by Michigan Court of Appeals 5/23/2012 11:07:40 PM

05/23/2012 13:01 FAX 810732453         QTFATICC              ☑001

STATE OF MICHIGAN

IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

         Plaintiff-Appellee

-vs-

**PHILLIP CHARLES GIBBS**

         Defendant-Appellant.

_____/

**Court of Appeals No. 306124**

**Lower Court No. 11-28140FC**

<u>**AFFIDAVIT OF ELVERTA THERESA GIBBS**</u>

STATE OF MICHIGAN  )
                   ) ss.
COUNTY OF GENESSEE)

        Elverta Theresa Gibbs, being duly sworn, hereby deposes and says that:

1. I am the mother of Phillip Charles Gibbs, the defendant in the above-mentioned case.

2. I was present on June 28, 2011 in Judge Judith A. Fullerton's courtroom at the Genessee County Circuit Court, for the purpose of attending the trial of Mr. Gibbs and his co-defendant Tyrell Henderson.

3. Myself, my daughter, my son-in-law and other members of the public were prevented from entering the courtroom during jury selection in the case. After being turned away at the door, I waited in the hallway outside the courtroom.

4. I understand that at one point, I was listed as a possible witness in the case, but I do not understand why other members of my family and the co-defendant's family were denied access to the proceedings during jury selection.

5. Present with me was my daughter Seandra Davidson-Coleman and my son-in-law Courtney Jones.

6. The above information is true to the best of my knowledge and belief.

7. If called to testify at a hearing, my statements would be the same as they are outlined above.

                               _Elverta Gibbs_
                               **Elverta Theresa Gibbs**

Subscribed and sworn to before me
May 21, 2012
_Lisa A. Lamarre_
Lisa Ann Lamarre
Notary Public, Wayne County, Michigan
My commission expires: 6/6/2018

RECEIVED by Michigan Court of Appeals 5/23/2012 11:07:40 PM

STATE OF MICHIGAN

IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

Plaintiff-Appellee

Court of Appeals No. 306124

Lower Court No. 11-28140FC

-vs-

**PHILLIP CHARLES GIBBS**

Defendant-Appellant

_____/

**AFFIDAVIT OF SEANDRA DAVIDSON-COLEMAN**

STATE OF MICHIGAN )
                   ) ss.
COUNTY OF GENESSEE )

    Seandra Davidson-Coleman, being duly sworn, hereby deposes and says that:

1. I am the sister of Phillip Charles Gibbs, the defendant in the above-mentioned case.

2. I was present on June 28, 2011 in Judge Judith A. Fullerton's courtroom at the Genessee County Circuit Court to attend the trial of Mr. Gibbs and his co-defendant Tyrell Henderson.

3. I was told by a male person in Judge Fullerton's courtroom that I could not be present in the courtroom while the jury was being picked for Mr. Gibbs' case.

4. After being prevented from sitting inside the courtroom, I waited outside with other family members.

5. We eventually decided to leave the courthouse after being told that jury selection would take all day.

6. We were allowed to enter the courtroom the next day, but only after the jury had been picked.

7. Present with me was my mother Theresa Gibbs and Courtney Jones.

8. The above information is true to the best of my knowledge and belief.

9. If called to testify at a hearing, my statements would be the same as they are outlined above.

                                                           **Seandra Davidson-Coleman**

Subscribed and sworn to before me
May 21, 2012

Lisa Ann Lamarre
Notary Public, Wayne County, Michigan
My commission expires: 6/6/2018

RECEIVED by Michigan Court of Appeals 5/23/2012 11:07:40 PM

**APPENDIX 3**

# Court of Appeals, State of Michigan

## ORDER

People of MI v Phillip Charles Gibbs

Docket No.   306124

LC No.   11-028140-FC

Pat M. Donofrio
Presiding Judge

E. Thomas Fitzgerald

Elizabeth L. Gleicher

Judges

The Court orders that the motion to remand pursuant to MCR 7.211(C)(1) is GRANTED and the matter is remanded to the trial court so that defendant-appellant may file a motion for resentencing regarding Prior Record Variables 5 and 6. Defendant-appellant may also move for a new trial and the trial court shall conduct an evidentiary hearing based on the closure of the courtroom during voir dire. Proceedings on remand are limited to the issues as raised in the motion to remand.

Defendant-appellant is to file with this Court a copy of any motion and any supporting brief filed in the trial court within 14 days of the Clerk's certification of this order. The trial court is to hear and decide the matter within 56 days of the Clerk's certification of this order. Defendant-appellant must also file with the Clerk of this Court copies of all orders entered on remand within 14 days after entry.

The trial court is to make findings of fact and a determination on the record. The trial court is to cause a transcript of any hearing on remand to be prepared and filed within 21 days after completion of the proceedings.

Defendant-appellant may file a supplemental brief pertaining to the issues raised on remand within 21 days after entry of the trial court's order deciding the matter or 21 days after the transcript of the hearing on remand is filed, whichever is later. Plaintiff-appellee may file a supplemental brief in response.

This Court retains jurisdiction in the cause, and the time for proceeding with the appeal in this Court begins upon issuance of an order in the trial court that finally disposes of the remand proceedings. Nevertheless, the time for proceeding with the appeal begins 14 days from the date of certification of this order if remand pleadings are not filed in the trial court within the 14-day period.



A true copy entered and certified by Larry S. Royster, Chief Clerk, on



**JUN 2 0 2012**

Date

Chief Clerk

**APPENDIX 4**

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

v.                                    Circuit Court No.
                                      11-28140-FC

PHILLIP CHARLES GIBBS,

Defendant.

MOTION

BEFORE THE HONORABLE JUDITH A. FULLERTON, CIRCUIT JUDGE

Flint, Michigan - Monday, July 16, 2012

APPELLATE DEFENDER OFFICE

RECEIVED

AUG 14 2012

DIGITALLY RECORDED

APPEARANCES:

For the People:        Vikki Bayeh-Haley (P-43811)
                       Rebecca Ann Jurva-Brinn (P-68790)
                       Assistant Prosecuting Attorney
                       100 Courthouse
                       Flint, Michigan 48502
                       (810) 257-3232

For the Defendant:     Brandy Y. Robinson (P-66895)
                       State Appellate Defender Office
                       645 Griswold
                       Penobscot Bldg., Ste. 3300
                       Detroit, Michigan 48226
                       (313) 256-9833

Transcribed By:        Cynthia R. Grossbauer, CER 8101
                       900 S. Saginaw St., Room 308
                       Flint, Michigan 48502
                       (810) 768-7933

1

TABLE OF CONTENTS

                                    PAGE

WITNESSES:  PEOPLE

NONE

WITNESSES:  DEFENDANT

NONE

EXHIBITS:        IDENTIFIED    RECEIVED

NONE

2

1  Flint, Michigan

2  Monday, July 16, 2012

3  9:17 o'clock a.m.

4  THE COURT: --set for a motion this morning,

5  case 11-28140. I see Ms. Raley's appearing for the

6  People. And Ms. Robinson? Is that correct, ma'am?

7  MS. ROBINSON: Yes, your Honor, appearing

8  for the defendant.

9  THE COURT: Right. We had another case with

10  the State Appellate Defender at 8:15. Okay, well, at

11  this time, Ms. Robinson, go right ahead, thank you.

12  MS. ROBINSON: Thank you, your Honor. As

13  the Court knows, we are here on remand from the Court

14  of the Appeals by way of an order that was entered by

15  that Court on June 20th, of this year for two purposes:

16  one, is that in his brief on appeal, the defendant has

17  argued that a new trial is warranted based on the

18  closure of the courtroom to members of his family

19  during the jury selection process. And so that is the

20  first basis--the only basis really for the new trial

21  motion that's pending before this Court. And I would

22  really just want to rest on our--our pleadings as to

23  that issue. The--the only point that I would make is

24  this, we are aware that the Michigan Supreme Court has

25  recently issued its decision in People v Vaughn

1  suggesting that even if--well suggesting that in that

2  case because the issue was not preserved by

3  contemporaneous objection by counsel it was subject to

4  plain error analysis and forfeited not waived and they

5  didn't believe that under the facts established there

6  that a new trial was warranted. In Mr. Gibbs' case,

7  the--the primary thing that I would point out is that

8  these were actually members of his family who were

9  denied access on--to the courtroom. The record is a

10  little bit unclear as to exactly what happened. There

11  are statements from the Court that suggest that there

12  was an invitation that leads to the people who were

13  already inside that they could come in. But as to

14  people who were outside the affidavit says--the

15  defendant's family suggest that there was some--some

16  limitation on their right to enter.

17  I also would pre--continue with this issue

18  notwithstanding the Supreme Court opinion in the issue

19  of preservation of the issue for further appeal. The

20  U.S. Supreme Court has actually made some--some

21  references, I believe it's an expressly--the opinion

22  cited by the defendant's brief that the public has a

23  right to be present whether or not any party has from

24  pages 724 and 725 of the--of the (inaudible) opinion

25  that's cited in the brief, so. I'm not sure what the

1  Court's pleasure is in terms of proceeding. My--my
2  indicate--my preference would be given that we have a
3  remand order from the Court of Appeals that we go
4  ahead with the evidentiary hearing to present the
5  testimony of the--the defendant's witnesses and any of
6  the Court's personnel who can illuminate.
7      THE COURT: How about the Court's
8  illumination? Nobody asked me.
9      MS. ROBINSON: I would, I mean--
10     THE COURT: I have a record. I have a
11 transcript of that very morning. Ms. Haley and me
12 must have it. The Court of Appeals obviously didn't
13 have it.
14     MS. ROBINSON: No, I--I did in the--in the
15 brief that I presented to the Court, I pointed out
16 that there were statements by--by you, the Judge, to
17 say that anybody who wants to come into the courtroom
18 can but my--I guess what I'm saying is that it seems
19 to me that it's--it's possible that what is happening
20 inside the courtroom may not be communicated perfectly
21 outside the courtroom. And that--there does seem to
22 be some--some conflict in that respect.
23     THE COURT: Well do you think the Court has
24 gone so far to say now I have to go out in the hallway
25 and troll up and down and ask people to come in if

5

1  they want to?
2      MS. ROBINSON: Not at all, your Honor. But-
3      THE COURT: I'm just trying to find out
4  because when I called the case everybody is in the
5  room and then we have issues with respect to
6  sequestration of witnesses and then if we have anybody
7  that wants to watch the voir dire, we have chairs and
8  they do them right over here, likewise other there,
9  whichever courtroom it was I don't remember for them
10 to sit over here at the side not in the middle of the
11 jury pull where they can't sit in the middle of the
12 jury pull and the voir dire. And I will go further,
13 once we start with the selection in filling the seats,
14 I do not allow anybody to come or go. So if that
15 clarifies it and I'm suppose to stop and let people
16 come and go. If they came after we started, then they
17 would not have been allowed in. I absolutely agree.
18 And the mother I do believe was in because she was on
19 the witness list as you pointed out and I kinda
20 remember that she had to step out because of the
21 sequestration motion. So I don't think there's much
22 else I can say of that. I can't troll in the halls
23 for spectators. And if someone wants in, we have
24 special arrangements for them to sit at the side out

6

1  of the jury pull. And if someone comes after we've
2  started selecting the jury, they will not be allowed
3  in, that's absolutely right. Ms. Haley? I don't know
4  what else I can tell you. Page four of the transcript
5  that's June 28, 2011, and sets forth what the Court
6  said right there. So Ms. Haley, anything further on
7  that point?
8        MS. BAYER-HALEY: Your Honor, we have--I
9  agree with the Court's analysis. The only thing I
10 just want to address, the defendant did not bring this
11 to the attention of the Court although there's a right
12 to a--the public has a right to a trial. He under the
13 Supreme Court decision in Vaughn is--is limited to now
14 establishing that it was plain error affecting his
15 substantial rights. The point of a timely assertion
16 has to be made at the--at the point of trial. If the
17 defendant doesn't bring it to the Court's attention or
18 makes the request at the time the Court's in a
19 position to do something about it, it puts forth in
20 again as it is in this case, so he is going to have to
21 show to the Court of Appeals that--that it affected
22 his substantial rights and there would be nothing I
23 would anticipate he would be able to show that it
24 affected the outcome of the verdict. And nothing
25 further on that issue.

7

1        THE COURT: Ms. Robinson, anything further?
2        MS. ROBINSON: And like I said, Judge, the
3  only--the only distinction that I would point out is
4  that no, I--I agree whole heartedly the Court is not
5  required to get up and go and, you know, comb the
6  hallways for people who want to come inside. But this
7  Court does have staff that has to make sure that is
8  acting in accordance with--with what the requirements
9  are from the U.S. Supreme Court about holding--keeping
10 the trial open until--pretty simple it may have been
11 one of the Court's personnel.
12       THE COURT: I'm telling you, after we start,
13 when the panel is in the room, you're absolutely right
14 no one would be coming or going. I agree with that.
15 If that's a violation, then I violated. I don't have
16 them in afterwards of that period nobody comes and
17 goes. And if a juror has to go to the bathroom, the
18 deputy or court clerk has to take them. We can't do
19 that during jury selection. It's much too confusing.
20 And I think there was an issue in this one, Mrs. Haley
21 and Ms. Robinson, that defendant's clothes were not
22 right that morning or something and they had to--a
23 little problem getting him dressed right that day, I
24 see Mr. Skinner's talking about that on page four. He
25 might have grown or he might have lost weight, I don't

8

1 know which it was during the time he'd been
2 incarcerated and so I know his mother was down here
3 kinda help deal with his clothes, you see on page
4 three, Mr. Skinner I believe you're complaining of the
5 clothes your client indicated he outgrown his clothes.
6 So we had a little problem with that. So I'm sure she
7 was here. But I also quite sure I remember she was on
8 the witness list. And other than that unless somebody
9 told me they wanted to be in and wanted to stay then
10 they would not have been allowed in during the jury
11 selection.
12     MS. ROBINSON: Right. And because we don't
13 have the testimony specifically from the witnesses,
14 I'm not sure at what point--that would have been in
15 case, and I--you know, as the Court said--
16     THE COURT: I'm guaranteeing you if I said
17 please come in and sit and they didn't do it that is
18 not something I can control, ma'am. If they don't
19 come in and stand here and sit down in the chairs, I
20 can't go out there and lasso with a rope and bring
21 them in. I can't do that. I just don't think the
22 Court is required to go out in the hall and entice
23 people to come in.
24     MS. ROBINSON: No. And that--that's not
25 (inaudible), your Honor.

9

1     THE COURT: Thank you. Let's move on to
2 this next issue about the resentencing, Ms. Haley? If
3 you'll go to that one, Ms. Robinson, thank you.
4     MS. ROBINSON: There are two sentencing
5 errors that we submit have occurred in this case and
6 they are with regard to PRV 5 and PRV 6. And it's
7 important to note that in PRV 5 in particular the one
8 which as it applies to juvenile offenses is distinct
9 from the language as it applies to adult offenses. If
10 the Court takes a look at the language of PRV 5, to
11 assess these points against a defendant for prior
12 misdemeanor juvenile adjudications and this language
13 is defined right in the text of the variable, it says
14 the conduct that if--oh, I'm sorry, actually I'm
15 reading from--from this wrong--the wrong portion of the
16 guidelines. I've got that text but it's actually what
17 the definition is of prior juvenile adjudication, so
18 I've got it cited in my brief, your Honor.
19     Under PRV 5--oh, the statutes it's MCL
20 777.55 subsection 3b, prior misdemeanor juvenile
21 adjudication means a juvenile adjudication for conduct
22 that if committed by an adult would be a misdemeanor
23 under a law of this State and then it goes on to say
24 if the order of disposition was entered before the
25 sentencing offense was committed. And that's really

10

1   the distinction it's if the order of disposition was
2   entered before the sentencing offense was committed.
3   If the Court recalls, this offense happened October
4   26th, of 2010. According to the presentence
5   investigation report, the order of disposition for the
6   crime that's being scored under PR by--PRV 5 is not
7   entered until November 9th, of 2010, which is after
8   this offense was committed. So because of that
9   distinction which, you know, is something that I think
10  is easy to miss, PRV 5 should not have been scored at
11  all because the order of disposition was not entered
12  until after the sentencing offense was committed. And
13  so that's the argument that we've made as to PRV 5. I
14  don't know if the Court has questions on that?
15          THE COURT: Ms. Haley, do you want to
16  comment on that one?
17          MS. BAYEH-HALEY: I'm just reading it over
18  again, Judge.
19          THE COURT: Okay.
20          MS. BAYEH-HALEY: Judge, I know the order of
21  adjudication was entered after the offenses. There's
22  no dispute that there is was actually adjudicated
23  prior to the offense and committed this offense
24  between the adjudication and the--the final order
25  which is identified as an order of adjudication but

11

1   outstanding alone if it is rescored prior record
2   variable 5 for two points would not affect the
3   guidelines score. It would take him to twenty-seven.
4   And we believe--I understand counsel's argument--
5           THE COURT: Well right now it's scored at
6   twenty-seven on the PRV's.
7           MS. BAYEH-HALEY: Twenty-seven on the PRV of
8   the PRV 5 is rescored.
9           THE COURT: It would be twenty-five.
10          MS. BAYEH-HALEY: Twenty-five which would be
11  in the same level, D.
12          MS. ROBINSON: And if your Honor, I--she's
13  correct as if only PRV 5 is corrected. We've
14  obviously preserved an OV 13 issue in the Court of
15  Appeals but that's not subject to this remand
16  proceeding. But we do have an argument as to PRV 6 as
17  well. And there are two--two components to that
18  argument. I don't think the Court has to reach the
19  second component if it agrees with the defense as to
20  the first component.
21          The first component is that factually
22  speaking under PRV 6, there--there--there has been no
23  evidence by the preponderance standard that applies at
24  a sentencing hearing that Mr. Gibbs was on bond
25  between the time that that he was adjudicated by virtue of

12

his guilty plea and the--and the time that the order
of disposition was entered. And I do believe that the
burden is on the prosecution to present evidence to
support the scoring of the variable. I submitted
paperwork to the Court that indicates that if
anything, Mr. Gibbs was released to the custody and
care of his mother between the adjudication date and
the time that he was actually--the--the order of
disposition was entered placing him on probation. I
suspect that maybe, again, because these are juvenile
offenses there--there may be a bit of confusion but I
suspect that this variable got scored because
ultimately he was put on probation after everything
was disposed of. But the--the variable under PRV 6 is
not designed to--to--to apply to that situation. It's
while a person is awaiting--if--if you look at the
language, it--it--it doesn't contemplate the actual
order that was entered.

Now the second piece of it is more of a
legal argument which is that this particular guideline
was not designed to apply to juvenile adjudications at
all. And I--I lay out a fairly lengthy analysis on
that point. I think the one thing that is probably
the most persuasive and ind--and indicative of the
Legislature's intent is that the prior PRV 6 under the

13

judicial guidelines that were not binding upon this
Court specifically had language that--that said that
it--that PRV 6 also encompassed a relationship to the
criminal justice system that applied to relationship
determined by juvenile conditions or charges. And the
People v Stone case that I've cited in the brief
illuminates that point. That language was not carried
over into PRV 6 in its current form that is binding
upon the Court. And I--I do think that says a lot
about what the Legislature intended there. But like I
said, the Court, in my judgment, doesn't have to reach
the second component of the argument if it agrees that
that's factually there is no evidence that the
defendant was in fact on bond. And so if--if the
Court agrees with our analysis as to PRV 6 alone, the
guidelines range certainly changes. That we argue
that both PRV 5 and 6 should be rescored and that Mr.
Gibbs would be entitled to a resentencing under the
circumstances.

Just one final point as to procedurally with
where things are, if the Court is inclined to hold an
evidentiary hearing in relationship to the request for
a new trial--

THE COURT: No, I think we've passed that
one, I said.

14

1
2      MS. ROBINSON: Okay.  So the Court is
3  denying--
4      THE COURT: Yes, I'm denying the motion for
5  new trial.
6      MS. ROBINSON: Okay.
7      THE COURT: I don't see any need for it.
8      MS. ROBINSON: Okay.  All right.  Well then
9  that would obviate what I was going to suggest which
10  is to hold a resentencing hearing immediately after
11  the--
12      THE COURT: Well, I'm gonna let her speak if
13  she wants to about the PSV 6 issue also.
14      MS. ROBINSON: Sure.
15      THE COURT: And of course, I don't have any
16  transcripts from the probate court unless somebody
17  else appeared them from Judge Newblatt's Court to see
18  what he said because I don't know what he said when he
19  took the plea and then set a date in the future for
20  sentencing. And Ms. Jurva's much more experienced
21  with probate, so, I don't know what they say.
22      MS. JURVA-BRINN: I've never appeared before
23  Judge Newblatt though, so I'm not sure how Judge
24  Newblatt handles it unfortunately.
25      THE COURT: He'd defer the date for

15

---

1  sentencing, so he's pending adjudication on a criminal
2  matter in the probate court. Ms. Haley, go ahead.
3      MS. BAYEH-HALEY: Judge, I believe that was-
4  -that was correctly scored. He's charged with a
5  conviction and he is ending the order of adjudication
6  which is the equivalent to the sentence and it was
7  after his plea so there's definitely the relationship
8  there. We believe that prior record variable 6 does
9  apply to juvenile convictions. Counsel does refer to
10  the fact that juvenile or a different procedure and
11  are not considered quasi or not considered--the
12  proceedings are not considered criminal as they are in
13  an adult proceeding, but it's still the same criminal
14  justice system even though the proceedings may be
15  different. The purpose of the juvenile criminal
16  justice system is to allow the juvenile an opportunity
17  to rehabilitate and not have this set on his permanent
18  record as an adult which is contrasted by an adult
19  system or it is on his juvenile record or his adult
20  record. But however it's still the same criminal
21  justice system and there's been case law that is
22  referred to the juvenile system is as at least quasi
23  criminal even though they do not use the same
24  terminology. They don't use the terms of convictions
25  like they do in the adult system for practical

16

1  administration of justice. It's just a different type
2  of system that they've set up. So we believe that is
3  correct. As might want to know in overall in terms of
4  the overall resentencing if the Court were to disagree
5  with the People's analysis and rescore PRV 6 it would
6  take him into a different grid, however, if the record
7  reflects he would have received the same sentence
8  regardless. Resentencing would not be required I
9  believe in this case. Even under the C grid that he
10 would fall within that same range. But even where the
11 record would indicate that it's a--he would receive
12 the same sentence than resentencing isn't required.
13 And if those factors were not considered by the
14 sentencing guidelines, they would be right to be
15 considered potentially a substantial and compelling
16 reasons factors that the guidelines neglected to
17 consider.
18        THE COURT: Ms. Robinson, anything else
19 you'd like to say today?
20        MS. ROBINSON: Again, I don't think that
21 factually the--the government has met its burden--
22 burden of showing that Mr. Gibbs was on bond for
23 misdemeanor while his--he--while--while this offense
24 had been committed. So I don't think factually they
25 have met the--the test under PRV 6 for scoring the

17

1  variable.
2        I would also note that the current
3  guidelines range under which he was scored was serving
4  his sentence with one twenty-six to two ten, I
5  believe, and so if the PRV 6 is to be rescored, the
6  range becomes one o eight to one eighty and so his
7  current sentence is in fact a departure from the
8  correct guideline range and so I think resentencing
9  would be required. The only thing that we've--and
10 we've been doing it for State Appellate Defender
11 Office is--is we--we have engaged the services of a
12 social worker who can give the Court a more complete
13 analysis of the defendant and his background and his
14 two years as an individual and we hope to present that
15 sort of information to guide the Court's decision
16 making as to a final sentence if the request for
17 resentencing is granted.
18        THE COURT: All right, the Court notes I
19 have on the presentence report received by me at the
20 time the fact that he had the juvenile history with
21 one B&E illegal entry without permission, plea entered
22 August 3rd of 2010, and the sentence was deferred to
23 November 9, 2010. The date of offense in this Court
24 was 10/26/10. He was obviously related to the
25 criminal justice system in the interim. I don't know

18

1  what Judge Newblatt calls it, but he's certainly
2  related to the criminal justice system because it is a
3  criminal case within the probate court because of his
4  age at that time. So the Court believes PRV 5 is
5  correctly scored for one prior misdemeanor
6  adjudication and that PRV 6 is correctly scored at 5
7  which is all it scored at because of his relationship
8  between a plea and sentence which is apparently formal
9  probation on 11/9 of 2010. So the Court does not
10 believe that the motion for resentencing is a viable
11 motion and will deny the motion for resentencing, as
12 well as, the motion for new trial and ask Mrs. Haley
13 to submit an order. Thank you.

14          MS. BAYEH-HALEY: Thank you, your Honor.

15          (At 9:37 a.m., proceedings concluded)

19

STATE OF MICHIGAN )
COUNTY OF GENESEE )

33

I, Cynthia R. Grossbauer, do hereby certify that this
transcript, consisting of 20 pages, is a complete,
true, and correct transcript to the best of my ability
of the videotaped proceedings taken in this case on
Monday, July 16, 2012, before the Honorable Judith A.
Fullerton, Circuit Judge.

Date: August 4, 2012

                    Cynthia R. Grossbauer, CER 8101
                    900 S. Saginaw St., #306
                    Flint, MI 48502
                    (810) 768-7933

20

**APPENDIX 5**

State of Michigan
In the Circuit Court for the County of Genesee
7th Judicial Circuit

People of the State of Michigan,
    Plaintiff,

Circuit Court No.11-28140 FC

vs

Judge: Fullerton

Phillip Charles Gibb,
    Defendant.

## Order

At a session of Court held on the
16th day of July 2012,
in the City of Flint,
Genesee County, Michigan



**A TRUE COPY**
Michael J. Carr, Clerk

HONORABLE JUDITH A. FULLERTON PRESIDING

This matter having come before the Court on Defendant's Motion for New Trial

and Defendant's Motion for Resentencing.

**IT IS HEREBY ORDERED** that Defendant's Motion to For New Trial is denied

for the reasons stated on the record.

**IT IS FURTHER ORDERED** that Defendant's Motion for Resentencing is

denied for the reasons stated on the record.

Dated:

_Judith A. Fullerton_
Judith A. Fullerton
Circuit Court Judge

Approved as to Form:

A66895

_Attorney for Defendant_

**RECEIVED**

JUL 2 4 2012

APPELLATE DEFENDER OFFICE

1

**APPENDIX 6**

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

PHILLIP CHARLES GIBBS,

       Defendant-Appellant.

FOR PUBLICATION
February 14, 2013
9:05 a.m.

No.  306124
Genesee Circuit Court
LC No.  11-028140-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

TYRELL HENDERSON,

       Defendant-Appellant.

No.  306127
Genesee Circuit Court
LC No.  11-028141-FC

---

Before:  K. F. KELLY, P.J., and MARKEY and FORT HOOD, JJ.

PER CURIAM.

In Docket No. 306124, defendant, Phillip Charles Gibbs, was convicted by a jury of two counts of armed robbery, MCL 750.529, one count of unarmed robbery, MCL 750.530, and one count of conspiracy to commit armed robbery, MCL 750.529.  Gibbs was sentenced to 17.5 to 30 years' imprisonment for each count of armed robbery, 100 months to 15 years' imprisonment for the unarmed robbery conviction, and 17.5 to 30 years' imprisonment for the conspiracy to commit armed robbery conviction.

In Docket No. 306127, defendant, Tyrell Henderson, was convicted by a jury of three counts of armed robbery, MCL 750.529, one count of conspiracy to commit armed robbery, MCL 750.529, one count of assault with intent to rob while armed, MCL 750.89, one count of carrying a concealed weapon, MCL 750.227, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.  Henderson was sentenced to 225 months to 40 years' imprisonment for each count of armed robbery, 225 months to 40 years' imprisonment for the conspiracy to commit armed robbery conviction, 225 months to 40 years' imprisonment for

-1-

the assault with intent to rob while armed conviction, 24 to 60 months' imprisonment for the carrying a concealed weapon conviction, and two years' imprisonment for the felony-firearm conviction.

Defendants were tried together in front of separate juries. They both appeal as of right.[1] We vacate Henderson's conviction for assault with intent to rob while armed, but otherwise affirm both defendants' convictions and sentences.

## I. BASIC FACTS AND PROCEDURAL HISTORY

### A. TRIAL

This case arises from an armed robbery that occurred at a store called Wholesale 4 U in Flint, Michigan, on October 26, 2010. Nancy Anagnostopoulos and her husband, Costas Anagnostopoulos, owned the store and were present at the time of the robbery. Also present was employee Jeremy Kassing. Defendants had been to the store together on numerous times that day. Originally, they had hoped to pawn some jewelry. After finding out that the jewelry had no value, Henderson purchased a video game. He later decided to return it. Defendants entered the store and told Costas that the game did not work. As Costas attempted to help determine what was wrong with the game, Henderson struck him behind the head with a gun. Gibbs, who was not personally armed during the incident, approached Nancy and removed her necklaces and ring. He took her identification and her purse. Gibbs also took an iPod from the store, as well as a number of laptop computers. In the meantime, Henderson took Costas' jewelry, wallet, and money. He ordered Costas to open the store's register and then took Costas to a back room where a safe was kept. Part of Costas' ear was cut off as a result of the blow he received and he received stitches for the injury. Kassing's wallet was also taken. A subsequent search of the home Gibbs shared with his mother uncovered a sandwich bag containing jewelry, a sandwich bag containing papers and the identifications of the three victims, and several watches identified as those taken from the store.

In separate interviews with police, both defendants admitted to their involvement. However, Gibbs told the officer that his involvement was involuntary. Gibbs believed that they were going to the store to return the video game and had no idea that Henderson was planning a robbery. Gibbs stated that Henderson ordered him to take the victims' belongings and other store items. Gibbs testified at trial that he complied only because he did not want anything to happen to him.

The juries convicted defendants and they were sentenced as outlined above.

---

[1] On September 14, 2011, Henderson filed a claim of appeal and on September 16, 2011, Gibbs filed his claim of appeal. On December 7, 2011, this Court entered an order consolidating the appeals. *People v Gibbs*, unpublished order of the Court of Appeals, entered December 7, 2011 (Docket Nos. 306124, 306127).

## B. GIBBS'S MOTION FOR REMAND

On May 23, 2012, Gibbs filed a motion to remand with this Court in order to make two objections to his sentencing, develop his argument that he was denied the right to a public trial, and, alternatively, argue that his counsel was ineffective. We granted Gibbs's motion to remand and remanded for Gibbs to file a motion for resentencing regarding prior record variable (PRV) 5 and PRV 6 and to file a motion for a new trial. *People v Gibbs*, unpublished order of the Court of Appeals, entered June 20, 2012 (Docket No. 306124). We ordered the trial court to hold an evidentiary hearing based on the closure of the courtroom during voir dire. *Id.*

On remand, Gibbs argued that his right to a public trial was violated by the closing of the courtroom and the exclusion of his family from jury selection. Gibbs also argued that he was entitled to resentencing based on the incorrect scoring on PRV 5 and PRV 6. The trial court declined to conduct a full hearing on the court closure issue. The trial court admitted that its procedure was that, after jury selection begins, it does not allow people to enter or leave the courtroom. The trial court stated that if individuals came after they started, then they would not have been allowed in the courtroom. The trial court denied the motion for a new trial. The trial court also found that Gibbs was related to the criminal justice system on the date of the offenses for purposes of scoring PRV 5 and PRV 6 and denied the motion for resentencing.

## II. GIBBS'S APPEAL

## A. RIGHT TO A PUBLIC TRIAL

Gibbs argues that the trial court violated his right to a public trial and that he is entitled to automatic reversal. We disagree.

Defendant did not object to the closure at trial. The Michigan Supreme Court recently held that the plain error standard applies to a defendant's forfeited claim that the trial court violated his Sixth Amendment right to a public trial. *People v Vaughn*, 491 Mich 642, 664, 674; 821 NW2d 288 (2012).

> [I]n order to receive relief on [a] forfeited claim of constitutional error, [a] defendant must establish (1) that the error occurred, (2) that the error was "plain," (3) that the error affected substantial rights, and (4) that the error either resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. [*Id.*, 491 Mich at 664-665 (footnote with citation omitted).]

The *Vaughn* Court found that the first two prongs of the analysis were satisfied because the trial court ordered the courtroom closed before voir dire without advancing "an overriding interest that is likely to be prejudiced" and the error was "clear or obvious" because it was "readily apparent" that the trial court closed the courtroom and it is "well settled" that the right to a public trial extends to voir dire. *Id.* at 665 (footnotes with citations and internal quotation marks omitted). The Court also found that the third prong was satisfied because the closure of the courtroom was "a plain structural error." *Id.* at 666. However, the Court found that the fourth prong was not satisfied because "both parties engaged in a vigorous voir dire process," "there were no objections to either party's peremptory challenges of potential jurors," and "each party

expressed satisfaction with the ultimate jury chosen." *Id.* at 668-669. Additionally, the Court found that presence of the venire, members of the public, lessened the extent to which the closure implicated the defendant's right and guaranteed that the proceedings were subject to a substantial degree of public review. *Id.* at 668 (citation omitted). The Court concluded that the defendant was not entitled to a new trial. *Id.* at 669.

In *People v Russell*, 297 Mich App 707; ___ NW2d ___ (Docket No. 304159, issued September 4, 2012), slip op at 7, this Court stated that "the effect of a partial closure of trial does not reach the level of total closure and only a substantial, rather than compelling, reason for the closure is required." The Court found that the voir dire proceedings were partially closed because of limited capacity in the courtroom and that the limited capacity was a substantial reason for the closure. *Id.* Accordingly, the partial closure did not deny the defendant his right to a public trial. *Id.*

Gibbs contends that his family and members of the public were prevented from entering the courtroom during jury selection. The record reveals that before jury selection began, the trial court stated, "And if any spectators would like to come in they're welcome but they do have to sit over here by the law clerk, not in the middle of the pool." Gibbs submitted affidavits indicating that individuals were not allowed to enter the courtroom during jury selection. Even accepting Gibbs's contention as true, we find no error given the trial court's statement. It appears that the courtroom was opened to the public initially, but then closed once jury selection began. On remand, the trial court did not conduct a full hearing and acknowledged that once jury selection began, the courtroom was closed and suggested that it was "too confusing" to allow individuals to come and go during jury selection. Even if we were to find error based on the trial court's admitted refusal to allow individuals to enter once jury selection began, Gibbs is not entitled to a new trial or evidentiary hearing. As in *Vaughn*, both parties engaged in vigorous voir dire, there were no objections to either party's peremptory challenges, and each side expressed satisfaction with the jury. Further, the venire itself was present. Accordingly, Gibbs fails to satisfy the fourth prong as set forth in *Vaughn* and is not entitled to a new trial.

## B. PRE-ARREST SILENCE

Gibbs argues that the prosecutor violated his Fifth Amendment right to remain silent by using his pre-arrest silence to impeach his testimony and by referring to his pre-arrest silence during closing argument. We disagree.

Defendant failed to object to the prosecutor's questions during his cross-examination; therefore, the issue is unpreserved. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). To the extent that Gibbs's argument alleges prosecutorial misconduct, because Gibbs did not object to the prosecutor's statements, the issue is also unpreserved. *People v Cain*, ___ Mich App ___; ___ NW2d ___ (Docket No. 301492, issued December 20, 2012), slip op at 2. "This Court reviews unpreserved constitutional errors for plain error affecting substantial rights." *Id.* at 5. This Court also reviews unpreserved claims of prosecutorial misconduct for plain error. *Id.* at 2.

During Gibbs's testimony, the prosecutor asked Gibbs when he told his mother what happened and when he told the police that Henderson made him rob the store. The prosecutor

-4-

asked Gibbs if he went to the police station on October 26, 2010, or after he talked to his brother the next day.  In her closing argument, the prosecutor stated:

> Because remember despite what Phillip Gibbs testified to here in the courtroom about what his knowledge was, what his role or lack thereof was, he doesn't take an opportunity to run out of the store.  He doesn't call 911 from inside the store.  He doesn't run away separate from Mr. Henderson after this robbery occurred.  He doesn't tell his mother.  He doesn't go to the police.

The prosecutor again referred to Gibbs's failure to turn himself in during her rebuttal.

Contrary to Gibbs' assertion, the prosecutor did not violate his constitutional right to remain silent by questioning Gibbs about his failure to alert his mother or law enforcement as to the robbery.

> A defendant's constitutional right to remain silent is not violated by the prosecutor's comment on his silence before custodial interrogation and before *Miranda* warnings have been given.  A prosecutor may not comment on a defendant's silence in the face of accusation, but may comment on silence that occurred before any police contact.
>
> A prosecutor may comment on a defendant's failure to report a crime when reporting the crime would have been natural if the defendant's version of the events were true.  [*People v McGhee*, 268 Mich App 600, 634-635; 709 NW2d 595 (2005) (citations and internal quotation marks omitted).]

However, "[w]here it would not have been natural for the defendant to contact the police—where doing so may have resulted in the defendant incriminating himself—the prosecution cannot properly comment on the defendant's failure to contact the police." *People v Dye*, 431 Mich 58, 80; 427 NW2d 501 (1988).

The prosecutor's comments referred to Gibbs's pre-arrest silence and, therefore, did not violate his right to remain silent.  *McGhee*, 268 Mich App at 634.  The prosecutor's comments on Gibbs's failure to report the crime suggested that if Gibbs's testimony were true—that his participation in the robbery was coerced, then he would have called 911 or gone to the police immediately.  Gibbs, however, claims that it would not have been natural for him to contact the police because he would have believed Henderson might harm him.  We conclude that if Gibbs's version of the events were true—he did not know Henderson was going to rob the store and he was acting under duress by Henderson—then it would have been natural for him to contact the police.  Therefore, the prosecutor's comments were proper and there was no plain error.

## C.  SENTENCING ERRORS

Finally, Gibbs contends that he is entitled to resentencing based on the erroneous scoring of PRV 5, PRV 6, and offense variable (OV) 13.

Under MCL 769.34(10), if a minimum sentence is within the appropriate guidelines sentence range, we must affirm the sentence and may not remand for

resentencing absent an error in scoring the sentencing guidelines or reliance on inaccurate information in determining the sentence. A sentencing court has discretion in determining the number of points to be scored, provided that evidence of record adequately supports a particular score. Scoring decisions for which there is any evidence in support will be upheld. Additionally, we review de novo as a question of law the interpretation of the statutory sentencing guidelines. [*People v Endres*, 269 Mich App 414, 417; 711 NW2d 398 (2006) (citations omitted).]

### 1. PRV 5

"Prior record variable 5 is prior misdemeanor convictions or prior misdemeanor juvenile adjudications." MCL 777.55(1). The sentencing court must score two points if "[t]he offender has 1 prior misdemeanor conviction or prior misdemeanor juvenile adjudication." MCL 777.55(1)(e). The sentencing court must assess zero points if "[t]he offender has no prior misdemeanor convictions or prior misdemeanor juvenile adjudications." MCL 777.55(1)(f).

"Prior misdemeanor juvenile adjudication" means a juvenile adjudication for conduct that if committed by an adult would be a misdemeanor under a law of this state, a political subdivision of this state, another state, a political subdivision of another state, or the United States *if the order of disposition was entered before the sentencing offense was committed*." [MCL 777.55(3)(b) (emphasis added).]

Gibbs's presentence investigation report (PSIR) indicates that he pleaded guilty to illegal entry without the owner's permission, a misdemeanor, on August 3, 2010, and was sentenced to probation for the offense on November 9, 2010. This was a juvenile adjudication. The PSIR indicates that the "Disposition Date" was November 9, 2010. The sentencing offense was committed on October 26, 2010. Accordingly, the order of disposition was not entered before the sentencing offense was committed and Gibbs's juvenile adjudication does not constitute a "[p]rior misdemeanor juvenile adjudication" for purposes of assessing points under PRV 5. MCL 777.55(3)(b). Therefore, the trial court erred in assessing two points under PRV 5. However, because a reduction by two points from defendant's prior record variable score would not change his PRV Level, MCL 777.62, resentencing is not required.

### 2. PRV 6

"Prior record variable 6 is relationship to the criminal justice system." MCL 777.56(1). The sentencing court must score five points if "[t]he offender is on probation or delayed sentence status or on bond awaiting adjudication or sentencing for a misdemeanor." MCL 777.56(1)(d). The sentencing court must assess zero points if "[t]he offender has no relationship to the criminal justice system." MCL 777.56(1)(e).

As mentioned above, Gibbs's entered a plea to illegal entry without the owner's permission, a misdemeanor, on August 3, 2010, and was sentenced to probation for the offense on November 9, 2010. This was a juvenile adjudication. This Court has found that a defendant's prior juvenile adjudications supported the scoring of PRV 6. *People v Anderson*, ___ Mich App ___; ___ NW2d ___ (Docket No. 301701, issued October 23, 2012), slip op at 2 ("The phrase

'criminal justice system' is not limited to adversarial criminal proceedings.") Thus, contrary to Gibbs's assertion, points could be assessed under PRV 6 for his relationship with the juvenile justice system.

There is no evidence that Gibbs was on probation, delayed sentence status, or bond at the time of the sentencing offense. His PSIR indicates only that he was placed on probation at sentencing or disposition, which took place on November 9, 2010. It appears that Gibbs was, however, awaiting adjudication or sentencing at the time of the sentencing offense, given that he had already entered a plea. This Court has stated:

> *Endres* suggests that a five-point score for PRV 6 is not improper when the defendant committed the sentencing offense while awaiting adjudication or sentencing for a misdemeanor, regardless of his or her bond status. The case illustrates this Court's refusal to categorize a defendant as having no relationship with the criminal justice system when it is obvious that such a relationship exists. [*People v Johnson*, 293 Mich App 79, 88; 808 NW2d 815 (2011).]

Therefore, the trial court properly assessed five points under PRV 6, even if Gibbs was not on bond at the time he committed the sentencing offense.

### 3. OV 13

"Offense variable 13 is continuing pattern of criminal behavior." MCL 777.43(1). The sentencing court must assess 25 points if "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(c). "For determining the appropriate points under this variable, all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." MCL 777.43(2)(a). The sentencing court must assess zero points if "[n]o pattern of felonious criminal activity existed." MCL 777.43(1)(g).

Gibbs was convicted of two counts of armed robbery and one count of unarmed robbery, which are all crimes against a person. Gibbs's argues that his convictions arose out of one incident and that he could not be assessed 25 points. However, there is nothing in the language of MCL 777.43(1)(c) to support defendant's argument that multiple convictions arising from the same incident cannot be considered for scoring OV 13. In *People v Harmon*, 248 Mich App 522; 640 NW2d 314 (2001), the defendant was convicted of four counts of making child sexually abusive material. He photographed two fifteen-year-old girls. There were four photos in all – two of each girl, taken on a single date. *Id.* at 525. We held that 25 points were properly scored under OV 13 because of "defendant's four concurrent convictions." *Id.* at 532. Similarly, in this case, while the robberies arose out of a single criminal episode, defendant committed three separate acts against each of the three victims and these three distinct crimes constituted a pattern of criminal activity. Additionally, although some subsections of MCL 777.43 contain limitations on a trial court's ability to score for more than one instance arising out of the same criminal episode, subsection (1)(c) contains no such limitation. Accordingly, because multiple concurrent offenses arising from the same incident are properly used in scoring OV 13, the trial court did not abuse its discretion in scoring 25 points for that variable.

## III. HENDERSON'S APPEAL

### A. DOUBLE JEOPARDY

Henderson contends that his convictions for both assault with intent to rob while armed and armed robbery violate double jeopardy. The prosecution concedes error and writes: "Plaintiff agrees that defendant's conviction for assault with intent to rob while armed must be vacated because he is also convicted for [sic] armed robbery involving the same victim during the same criminal episode." We agree and that for purposes of the "multiple punishment" analysis under double jeopardy, assault with intent to rob while armed is the "same offense" as armed robbery and that Henderson's conviction for the lesser crime must be vacated. This Court reviews de novo questions of law, such as a double jeopardy challenge. *People v Garland*, 286 Mich App 1, 4; 777 NW2d 732 (2009).

The prohibition against double jeopardy in both the federal and state constitutions protects against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. US Const, Am V; Const 1963, art 1, § 15; *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004). The third of these protections exist to "protect the defendant from being sentenced to more punishment than the Legislature intended." *People v Meshell*, 265 Mich App 616, 628; 696 NW2d 754 (2005). In this case, defendant claims that he has been punished twice for the same offense.

We have previously held that assault with intent to rob while armed is a necessarily included lesser offense of armed robbery. *People v Akins*, 259 Mich App 545, 552; 675 NW2d 863 (2003); *People v Johnson*, 90 Mich App 415, 421; 282 NW2d 340 (1979). "A necessarily included lesser offense is a crime for which it is impossible to commit the greater offense without first having committed the lesser." *People v Walls*, 265 Mich App 642, 645; 697 NW2d 535 (2005). Stated differently, "[t]o be a necessarily included lesser offense, the elements necessary for commission of the greater offense must subsume the elements necessary for commission of the lesser offense." *People v Heft*, ___ Mich App ___; ___ NW2d ___ (Docket No. 307150, issued December 20, 2012) slip op at 3. However,

> [i]n *People v Smith*, 478 Mich 292, 315; 733 NW2d 351 (2007), our Supreme Court held that the "same elements" test set forth in *Blockburger v United States*, 284 US 299, 304; 52 SCt 180; 76 LEd 306 (1932), is "the appropriate test to determine whether multiple punishments are barred by Const 1963, art 1, § 15." . .
>
> .
>
> The *Blockburger* test focuses on the statutory elements of the offense, without considering whether a substantial overlap exists in the proofs offered to establish the offense. If each offense requires proof of elements that the other does not, the *Blockburger* test is satisfied and no double jeopardy violation is involved. [*People v Baker*, 288 Mich App 378, 381-382; 792 NW2d 420 (2010) (citations omitted).]

Accordingly, it is necessary to consider the elements of each offense.

-8-

MCL 750.89 is the assault with intent to rob while armed statute and provides:

> Any person, being armed with a dangerous weapon, or any article used or fashioned in a manner to lead a person so assaulted reasonably to believe it to be a dangerous weapon, who shall assault another with intent to rob and steal shall be guilty of a felony, punishable by imprisonment in the state prison for life, or for any term of years.

Therefore, in order to obtain a conviction for assault with intent to rob while armed, a prosecutor must demonstrate "(1) an assault with force and violence; (2) an intent to rob or steal; and (3) the defendant's being armed." *Akins*, 259 Mich App at 554 (citation and internal quotation marks omitted).

> The revised armed robbery statute, MCL 750.529, now provides:

> A person who engages in conduct proscribed under section 530 [robbery] and who in the course of engaging in that conduct, possesses a dangerous weapon or an article used or fashioned in a manner to lead any person present to reasonably believe the article is a dangerous weapon, or who represents orally or otherwise that he or she is in possession of a dangerous weapon, is guilty of a felony punishable by imprisonment for life or for any term of years. If an aggravated assault or serious injury is inflicted by any person while violating this section, the person shall be sentenced to a minimum term of imprisonment of not less than 2 years.

Therefore, in order to obtain a conviction for armed robbery, a prosecutor must prove:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007).]

We discern no substantive difference between the elements of the two crimes. Because assault with intent to rob while armed is a necessarily included lesser offense of armed robbery and neither crime contains an element the other does not, defendant could not have been convicted of both. Under the "same elements" test that is now applicable to the "multiple punishments" strand of double jeopardy under *Smith*, defendant's assault conviction must be vacated. *Meshell*, 265 Mich App at 633-634. ("The remedy for conviction of multiple offenses in violation of double jeopardy is to affirm the conviction on the greater charge and to vacate the conviction on the lesser charge.")

## B. SENTENCING ERRORS

Henderson also contends that he is entitled to resentencing based on the erroneous scoring of OV 3, OV 4, OV 13, and OV 14. We disagree.

Henderson preserved his objection to the scoring of OV 13 by objecting at sentencing. See *Endres*, 269 Mich App at 417. Henderson did not preserve his objections to the scoring of OV 3, OV 4, or OV 14. See *Endres*, 269 Mich App at 417.

> Under MCL 769.34(10), if a minimum sentence is within the appropriate guidelines sentence range, we must affirm the sentence and may not remand for resentencing absent an error in scoring the sentencing guidelines or reliance on inaccurate information in determining the sentence. A sentencing court has discretion in determining the number of points to be scored, provided that evidence of record adequately supports a particular score. Scoring decisions for which there is any evidence in support will be upheld. Additionally, we review de novo as a question of law the interpretation of the statutory sentencing guidelines. [*Endres*, 269 Mich App at 417 (citations omitted).]

This Court reviews unpreserved claims for plain error affecting a defendant's substantial rights. *Id.* at 422.

### 1. OV 3

"Offense variable 3 is physical injury to a victim." MCL 777.33(1). The sentencing court must assess 10 points if "[b]odily injury requiring medical treatment occurred to a victim." MCL 777.33(1)(d). "As used in this section, 'requiring medical treatment' refers to the necessity for treatment and not the victim's success in obtaining treatment." MCL 777.33(3). This Court has stated that "'bodily injury' encompasses anything that the victim would, under the circumstances, perceive as some unwanted physically damaging consequence." *People v McDonald*, 293 Mich App 292, 298; 811 NW2d 507 (2011).

Costas testified that Henderson hit him between his neck and head and on the side of the face. According to Nancy, Costas, had blood dripping down his face and neck. Part of Costas's ear was cut off and he received four stitches at Hurley Medical Hospital. He also sees his physician for frequent headaches. Nancy suffered whiplash and completed seven weeks of physical therapy. Therefore, the trial court properly scored 10 points for OV 3.

### 2. OV 4

"Offense variable 4 is psychological injury to a victim." MCL 777.34(1). The sentencing court must assess 10 points if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). The sentencing court must also "[s]core 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive." MCL 777.34(2).

This Court has found that depression and personality changes are sufficient to uphold the scoring of OV 4. *People v Ericksen*, 288 Mich App 192, 203; 793 NW2d 120 (2010). This Court has also found that a victim's "statements about feeling angry, hurt, violated, and

-10-

frightened support his score under our case law." *People v Williams*, _ Mich App ___; ___ NW2d ___ (Docket No. 306917, issued October 16, 2012), slip op at 2.

Kassing testified that the experience was traumatic and he had bad dreams about it. At sentencing, Nancy stated, "Not to mention what you took from us psychologically." In Costas's impact statement, he indicated that he did not feel safe in his store. These statements support the scoring of 10 points for OV 4.

### 3. OV 13

As mentioned above, because multiple concurrent offenses arising from the same incident are properly used in scoring OV 13, the trial court did not abuse its discretion in scoring 25 points for that variable.

### 4. OV 14

"Offense variable 14 is the offender's role." MCL 777.44(1). The sentencing court must assess 10 points if "[t]he offender was a leader in a multiple offender situation." MCL 777.44(1)(a). In scoring this variable, "[t]he entire criminal transaction should be considered." MCL 777.44(2)(a). See also *People v Apgar*, 264 Mich App 321, 330; 690 NW2d 312 (2004).

There was evidence that Henderson was the only perpetrator with a gun, did most of the talking, gave orders to Gibbs, and checked to make sure Gibbs took everything of value. Kassing specifically testified that he believed Gibbs was the leader. Further, Gibbs's testimony supports the finding that Henderson was the leader. While neither Nancy nor Costas believed that either of the defendants was "the leader," "[s]coring decisions for which there is any evidence in support will be upheld." *Endres*, 269 Mich App at 417. Accordingly, the trial court did not err in scoring 10 points for OV 14.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Jane E. Markey
/s/ Karen M. Fort Hood

-11-

**APPENDIX 7**

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

SHANE JOSEPH SMITH,

      Defendant-Appellant.

UNPUBLISHED
February 25, 2003

No.  229137
Monroe Circuit Court
LC No.  99-030211-FH

Before:  Markey, P.J., and Smolenski and Meter, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of operating a vehicle while his license was revoked, causing death, MCL 257.904(4) (count I), operating a motor vehicle while under the influence of intoxicating liquor (OUIL), causing death, MCL 257.625(4) (count II), manslaughter, MCL 750.321 (count III), and failure to stop at the scene of a serious personal injury accident, MCL 257.617 (count IV).  Defendant was sentenced to concurrent terms of seven to fifteen years' imprisonment each for counts I-III, and thirty-six to sixty months' imprisonment for count IV.  Defendant appeals as of right.  We affirm defendant's convictions, but remand for resentencing.

## I. Facts

On October 4, 1999, at approximately 6:50 p.m., defendant was driving his pickup truck on US-23 in Dundee Township.  Three witnesses testified that defendant was driving at a high rate of speed, at least 85 miles per hour, when defendant lost control of his vehicle and hit a pedestrian, Ronald Keeton, Jr., who had been walking on the side of the roadway.  Mr. Keeton died as a result of injuries sustained in the accident.  Defendant did not stop at the scene of the accident.

Officer Steven Pascoe was on duty four miles south of the accident when he heard central dispatch alert officers to be on the lookout for a red pickup truck that had left the scene of the accident.  After receiving word that a vehicle matching this description had exited the freeway at US-223 and headed west, Pascoe eventually located defendant's truck at a gas station which was still under construction.  Defendant's vehicle was parked next to a five-foot pile of dirt and behind a port-a-potty.  Pascoe inspected defendant's truck; no one was inside, but there was a beer can on the driver's side floor.

Shortly thereafter, Pascoe saw defendant running to a Sunoco gas station, about 200 yards away. Officer Marvin Carlson responded to the call for help and found defendant using the phone at the Sunoco gas station. Carlson handcuffed defendant and, at that point, defendant said something about being hijacked. Carlson arrested defendant and read him his rights. Defendant volunteered that he had been traveling south on US-23 when he picked up a hitchhiker. Defendant claimed that the hitchhiker pulled a gun on him, forced him into the passenger's seat, and began to drive his truck. Defendant said the hitchhiker was driving at a high rate of speed, driving stupid, and that he swerved and struck another car. Defendant claimed that he was able to escape and run away, and the hitchhiker continued on in his truck.

Carlson believed that defendant was visibly impaired due to alcohol consumption. He smelled alcohol on defendant's breath, defendant's speech was rapid and somewhat slurred, and defendant's eyes were bloodshot and glossy. Defendant admitted that he had two beers. Defendant was then taken to the hospital for a blood test, the results of which showed that defendant's blood alcohol level ("BAC") was .063 two and one-half hours after the accident. Forensic toxicologist Julia Pearson testified that defendant's BAC was between .09 and .11 during the accident, assuming he did not have a beer when he was driving; or between .07 and .09 had he consumed a beer during his drive. Carlson later determined that defendant's driving privileges had been revoked by the State of Michigan, and that notice of this revocation had been issued to defendant.

Van Buren Township Police Officer Lawrence Temple was permitted to testify about defendant's involvement in a hit and run accident which occurred on September 5, 1999. Temple stated that he was flagged down by a driver who told him that he had just been struck by a white F-150 pickup truck, and that the driver of that vehicle did not stop. Temple located the white F-150 pickup truck at a nearby gas station, where defendant and a woman were standing outside the driver's side door looking at the damaged mirror. Defendant initially said that the woman had been driving the truck. At first the woman agreed, but then she started crying, said she wasn't driving, and told defendant, "I'm not taking the rap for you this time." Defendant then admitted he had been driving. Temple testified that he noted a strong odor of intoxicants on defendant's breath. Temple also testified that he gave defendant a "driving permit," which informed defendant that his driving privileges were denied, revoked and expired as of that day.

Defendant testified that he had risen for work at 3:00 a.m., worked until 3:30 p.m., and then made several stops, finally leaving a friend's house sometime after 6:00 p.m. Defendant stated that from 4:00 p.m. to 6:00 p.m. he drank about four beers and ate some fried vegetables. On defendant's behalf, several witnesses testified that defendant had consumed fried vegetables and a total of four beers. None of the witnesses felt that defendant was intoxicated, but rather that he was tired. Defendant's expert witness testified that given defendant's food consumption, his BAC would have been at or below .06 at the time of the accident.

Defendant further testified that he had his cruise control set at seventy-eight miles per hour as he traveled southbound on US-23. He stated that he came up behind a car, which put on its turn signal to get over. He then looked down at some paperwork on his seat, and when he looked back up he saw that the car had not moved over. Defendant applied his brakes, but did not think he was going to be able to stop quickly enough; so he jerked the wheel to the right to go around the car. Defendant testified that he jerked too hard, and when he brought the wheel

back the other way the back end started to slide and spin. Defendant stated he heard a smash, and subsequently managed to straighten out his vehicle and pull off at an exit.

Defendant denied ever seeing a pedestrian and had no idea that he had hit anyone. Instead, he thought he hit a mile marker or a pole. Defendant stated that his ability to drive was not affected by the alcohol he drank and denied driving at an excessive speed. He also denied knowing that his driving privileges had been suspended by the State of Michigan. He did admit that he lied to the police when they found him after the accident, explaining that he "lost control," was not in his right frame of mind, and that he had no idea of what he was saying.

Defendant's accident reconstructionist testified that the markings on the road indicated defendant had made a hard right steer, and then a corrective left steer. The markings also indicated that defendant was traveling between 73 and 76 miles per hour at the time. Defendant's expert also testified that defendant's vision would not have been focused on the shoulder area, but rather on the roadway and on his own vehicle, and that defendant would have had less than three seconds to observe anyone on the shoulder.

Defendant was convicted and sentenced in the manner described above, and now appeals asserting numerous claims of error.

## II. Admissibility of Evidence

Defendant alleges that the trial court erroneously admitted several pieces of evidence. The decision whether evidence is admissible is within the trial court's discretion and should only be reversed where there is a clear abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). An abuse of discretion exists only when an unprejudiced person, considering the facts on which the trial court acted, would say there was no justification or excuse for the ruling made. *People v Rice (On remand)*, 235 Mich App 429, 439; 597 NW2d 843 (1999).

### A. Lay Opinions

Defendant argues that the trial court erred in allowing the testimony of three lay witnesses regarding the speed of his vehicle. We disagree.

Lay witness testimony in the form of an opinion is permitted where it is rationally based on the witness' perception and is helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. MRE 701; *Richardson v Ryder Truck Rental, Inc*, 213 Mich App 447, 455; 540 NW2d 696 (1995). Opinion testimony of lay witnesses with regard to speed has repeatedly been held to be admissible, even where the qualifications of the witnesses to judge speed are based on little more than their own assertion of their ability to do so, or the testimony borders on the incredible. *People v Zimmerman*, 385 Mich 417, 439; 189 NW2d 259 (1971) (Adams, J., separate opinion).[1]

---

[1] See also *Hammock v Sims*, 313 Mich 248, 21 NW2d 118 (1946); *Zylstra v Graham*, 244 Mich 319, 326; 221 NW 318 (1928); *People v Schwartz*, 215 Mich 197, 183 NW 723 (1921); *Mitchell v Steward Oldford & Sons, Inc*, 163 Mich App 622, 629; 415 NW2d 224 (1987); *Kuhnee v*
(continued...)

In this case, all of the witnesses gave some basis for their speed estimates rooted in their personal experiences, and their testimony regarding the speed of defendant's vehicle was certainly material to the case. Accordingly, we find that the trial court did not abuse its discretion in allowing their opinion testimony.

## B. 404(b) Evidence

Although defendant objected below, he failed to provide this Court with the transcript of the hearing at which the trial court considered and ruled on this issue. Therefore, because we were not provided with a record to review, defendant has waived review of this issue. *Thomas v McGinnis*, 239 Mich App 636, 649; 609 NW2d 222 (2000); *People v Anderson*, 209 Mich App 527, 535; 531 NW2d 780 (1995).

Defendant also raises a hearsay issue as it relates to the 404(b) evidence. Defendant did object below, but failed to frame this issue in his statement of questions presented on appeal; therefore, this issue is unpreserved. *People v Brown*, 239 Mich App 735, 748; 610 W2d 234 (2000). We review unpreserved, non-constitutional issues for plain error only. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

At trial, the prosecutor asked Officer Temple what information he obtained from the driver whose vehicle had been hit in the September 1999 hit-and-run incident. Over defendant's hearsay objection, Temple testified that the driver told him that he had just been struck by a white pickup, which was driven by a white male with a white female passenger headed westbound. Temple further testified that the driver said that his friend was following the white pickup truck and that the driver of the white pickup truck did not stop.

Hearsay is an out of court statement offered for the truth of the matter asserted, and is generally inadmissible. MRE 801(c); MRE 802. The prosecutor argued that the information was not being offered for the truth of the matter, but rather to show why the officer located defendant's vehicle, and the trial court agreed. However, while the driver's statements regarding the occupants and the color of the pickup truck could be construed as foundational, we believe that the driver's statement indicating that the pickup truck did not stop is clearly hearsay.

The reason the prosecutor presented Temple's testimony was to show that defendant did not leave the scene of this accident by mistake. Therefore, the evidence was offered for the truth of the matter asserted, i.e., to show that defendant did not stop at the scene of the September 1999 hit-and-run accident. Therefore, we find that the court abused its discretion in allowing this testimony. However, we find the error did not affect defendant's substantial rights, given the other evidence presented at trial. *Carines, supra* at 763.

---

(…continued)

*Miller*, 37 Mich App 649, 653-655; 195 NW2d 299 (1972); *People v Ray*, 2 Mich App 623, 635; 141 NW2d 320 (1966).

### III. Pre-trial Publicity

Defendant argues that he was denied the right to a fair and impartial jury, given the amount of pre-trial publicity in this case and the fact that nearly all the jurors admitted they had heard about the case from the media before trial. Because defendant failed to object at trial, we review this issue for plain error only. *Carines, supra* at 763.

The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. *People v Jendrzejewski*, 455 Mich 495, 501; 566 NW2d 530 (1997). Juror exposure to newspaper accounts of a defendant's crime does not in itself establish a presumption that the defendant has been deprived of a fair trial by virtue of pretrial publicity. *Id.* at 502. Whether or not prejudice warranting a new trial results from the reading of news articles or seeing or hearing broadcasts must turn on the special facts of each case, and the question is left largely to the determination and discretion of the trial court. *People v Grove*, 455 Mich 439, 472; 566 NW2d 547 (1997).

In this case, during the jury selection process, the court explored the issue of bias against defendant. None of the jurors indicated that they were biased against defendant or had already formed an opinion about defendant's guilt. In fact, only two potential jurors recalled hearing about the case through the media, one of whom defendant exercised a peremptory challenge to remove. Ultimately, defense counsel said that he was satisfied with the jury as seated and may not now harbor any alleged error as an appellate parachute. *People v Carter*, 462 Mich 206, 214-215; 612 NW2d 144 (2001). Thus, we find no error that affected defendant's substantial rights.

### IV. Constitutionality of MCL 257.904(4)

Defendant asserts that the statute which imposes criminal liability for operating a vehicle under a revoked license, causing death, MCL 257.904(4), is unconstitutional because it imposes strict liability. The constitutionality of a statute is a question of law that this Court reviews de novo. *People v Jensen (On Remand)*, 231 Mich App 439, 444; 586 NW2d 748 (1998). A statute is accorded a strong presumption of validity and this Court has a duty to construe it as valid absent a clear showing of unconstitutionality. *Id.*

MCL 257.904(4) provides,

> (4) A person who operates a motor vehicle in violation of subsection (1) and who, by operation of that motor vehicle, causes the death of another person is guilty of a felony punishable by imprisonment for not more than 15 years or a fine of not less then $2,500.00 or more than $10,000.00, or both. This subsection does not apply to a person whose operator's or chauffeur's license was suspended because that person failed to answer a citation or comply with an order or judgment pursuant to section 321a.

Subsection (1), referred to above, provides,

> (1) A person whose operator's or chauffeur's license or registration certificate has been suspended or revoked and who has been notified as provided in section 212 of that suspension or revocation, whose application for license has

-5-

been denied, or who has never applied for a license, shall not operate a motor vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of motor vehicles, within this state. [MCL 257.904(1).]

A strict liability crime is one for which the prosecutor need to prove that the defendant performed the wrongful act, regardless of whether he intended to perform it. *People v Lardie*, 452 Mich 231, 241; 551 NW2d 656 (1996). Here, it is clear from the wording of subsection (1) that the Legislature intended to hold a person liable under the above provision only if the person had knowledge that they were driving without a valid license. Where a statute requires a criminal mind for some but not all of its elements, it is not one of strict liability. *People v Quinn*, 440 Mich 178, 187; 487 NW2d 194 (1992). Therefore, MCL 257.904(4) is not a strict liability statute just because there is no intent requirement for the "causing death" element.

Defendant also contends that subsection (4) of the statute is unconstitutional because driving while one's license is suspended has no bearing on the person's ability to operate a motor vehicle; there is no casual relation between a person's decision to drive and the death of an individual, and thus, the provision violates his due process rights. We disagree.

MCL 257.904(4) is a general intent crime. The prosecutor needed to prove that defendant voluntarily drove a motor vehicle despite knowing that he was not entitled to do so. See *Lardie, supra* at 241. The statute is designed to discourage persons, who have been determine to be unfit drivers, from driving without being entitled to the privilege. 1998 PA 341. We find that MCL 257.904(4) is rationally related to a legitimate state purpose, and, therefore, is constitutional. *Mahaffey v Attorney General*, 222 Mich App 325, 344; 564 NW2d 104 (1997); see also *Quinn, supra* at 187. "A statute is not unconstitutional merely because it is undesirable, unfair, or unjust." *Phillips v Mirac, Inc*, 251 Mich App 586, 589; 651 NW2d 437 (2002).

### V. Sufficiency of the Evidence

We review de novo challenges to the sufficiency of the evidence at trial. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). In determining whether sufficient evidence has been presented to sustain a conviction, an appellate court is required to view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Jaffray*, 445 Mich 287, 296; 519 NW2d 108 (1994).

Defendant asserts that there was insufficient evidence to support his convictions for operating a motor vehicle while impaired, causing death, MCL 257.625(4), manslaughter with a motor vehicle, MCL 750.321, and operating a motor vehicle with a revoked license causing death, MCL 257.904(4). Again, we disagree.

MCL 257.625(4) provides that "[a] person, whether licensed or not, who operates a motor vehicle in violation of subsection (1) or (3) and by the operation of that motor vehicle causes the death of another person" is guilty of a crime. MCL 257.625(1) and (3) provide,

(1) A person, whether licensed or not, shall not operate a vehicle upon a highway or other place open to the general public or generally accessible to motor

vehicles, including an area designated for the parking of vehicles, within this state if either of the following applies:

> (a) The person is under the influence of intoxicating liquor, a controlled substance or a combination of intoxicating liquor and a controlled substance.

> (b) The person has an alcohol content of 0.10 grams or more per 100 milliliters of blood, per 210 liters of breath, or per 67 milliliters of urine.

* * *

> (3) A person, whether licensed or not, shall not operate a vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state when, due to the consumption of intoxicating liquor, a controlled substance, or a combination of intoxication liquor and a controlled substance, the person's ability to operate the vehicle is visibly impaired ....

Defendant's involuntary manslaughter conviction required that the prosecution prove that defendant operated his vehicle in a grossly negligent manner, *Lardie, supra* at 247-248, and caused the death of another, *People v Tims*, 449 Mich 83, 94; 534 NW2d 675 (1995).

The prosecution's forensic toxicologist testified that defendant's blood alcohol level was between .09 and .11 during the accident, assuming he did not have a beer when he was driving. Moreover, the arresting officer testified that he believed that defendant was visibly impaired due to alcohol consumption. Also, there was testimony that defendant was driving at a high rate of speed in an erratic fashion. This evidence, viewed most favorably to the prosecution, was sufficient to enable the jury to find that defendant was guilty of OUIL causing death and manslaughter with a motor vehicle.

Defendant contends that his conviction under MCL 257.904(4) should be reversed because there was insufficient evidence to show a causal connection between his driving with a revoked license and the victim's death. As support for his contention, defendant cites *Lardie, supra.*

In *Lardie*, the Court held that MCL 257.625(4), operation of a motor vehicle while intoxicated causing death, required proof of causation, i.e., the prosecutor must establish that the particular defendant's decision to drive while intoxicated produced a change in that driver's operation of the vehicle that caused the death. *Id.* at 234; 257-258. In reaching its conclusion, the Court considered the Legislature's intent, which was to reduce fatalities by deterring drunken driving. *Id.* at 257. Therefore, the statute must have been designed to punish drivers only when their drunken driving caused another's death. *Id.* at 257-258.

In this case, the statute was enacted to address the problem of individuals who engage in drunk driving and have their license suspended or revoked, yet continue to drive on these invalid licenses. 1998 PA 341. The statute was obviously designed to punish drivers who cause a fatal accident because they disregarded their revoked or suspended status. The prosecution presented evidence that the state issued notice to defendant that his license was revoked, and additionally,

that defendant had been drinking.  Therefore, we find that, viewing the evidence in a light most favorable to the prosecution, the evidence was sufficient to support the conviction.

## VI.  Sentencing Issues

Defendant argues that the trial court erred in scoring offense variables ("OV") 9, 13, and 18.[2]

A sentencing court has discretion in determining the number of points to be scored, provided that evidence of record adequately supports a particular score.  *People v Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002).  Scoring decisions for which there is any evidence in support will be upheld.  *Id.*

### A.  OV 9

Defendant contends that OV 9 was improperly scored at ten points.  Ten points is properly scored if there are between two and nine victims.  Each person who is placed in danger of injury or loss of life is considered a victim.  MCL 777.39.  The evidence indicated that there were four victims, Beth Ann Lay and her two children who were in the car that defendant passed and the decedent, Mr. Keeton.  Ms. Lay testified that defendant pulled up behind her out of nowhere, driving at a high rate of speed, swerved to her right, hit Mr. Keeton, then cut back in front of her.  The court properly assessed ten points.

### B.  OV 13

Defendant also disputes the twenty-five points which were scored for OV 13.  Twenty-five points are properly scored for OV 13 if "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person."  MCL 777.43(1)(b).[3]  MCL 777.43(2)(a) states that "[f]or determining the appropriate points under this variable, all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction."  Zero points should be scored if there is no pattern of felonious criminal activity.  MCL 777.43(1)(f).

At sentencing, the prosecutor argued that OV 13 was properly scored at twenty-five points because there were four felony convictions, but conceded that there was no pattern of felonious criminal activity over the past five years outside the instant offenses.  The court concluded that, while there was no pattern in the sense that defendant had prior felony convictions, the twenty-five point score was supported based on defendant's multiple convictions.

The proper application of the statutory sentencing guidelines is a legal question reviewed by this Court de novo.  *People v Libbett*, 251 Mich App 353, 365; 650 NW2d 407 (2002).  In

---

[2] The offenses here were committed in October 1999; therefore, this matter is controlled by the legislative sentencing guidelines.  MCL 769.34(2); See *People v Reynolds*, 240 Mich App 250, 253; 611 NW2d 316 (2000).

[3] MCL 777.43 was amended by 1999 PA 279, effective October 1, 2000.

construing OV 13, we must assign the words their plain and ordinary meaning. *Id.* The use of the term "pattern" and the fact that the Legislature permitted consideration of all crimes within a five-year period evinces an intention that it is repeated felonious conduct that should be considered in scoring this offense variable.

In *People v Harmon*, 248 Mich App 522, 532; 640 NW2d 314 (2001), the Court held that twenty-five points were properly scored because of "defendant's four concurrent convictions" in that case. The defendant was convicted of four counts of making child sexually abusive material, which were based on defendant's activities in photographing two fifteen-year-old girls. Four photos, two of each girl, taken on a single date, supported defendant's four convictions. *Id.* at 525. We believe that this case is distinguishable from *Harmon* because defendant's convictions stemmed from one incident, not four individual acts. Therefore, we conclude that the trial court improperly scored OV 13 at twenty-five points; rather, no points should have been scored.

## C. OV 18

Defendant also contends that the five point score for OV 18 is erroneous. Five points are to be scored for OV 18 if the offender operated a vehicle when his bodily alcohol content was 0.07 or more but less than 0.10 grams per 100 milliliters of blood, or while the offender was visibly impaired by the use of intoxicating liquor. MCL 777.48. The evidence indicated that defendant's blood alcohol level was between .09 and .10 during the accident, assuming he did not have a beer when he was driving. His blood alcohol level would have been between .07 and .09 had he consumed a beer during his drive. Moreover, the arresting officer testified that defendant was visibly impaired due to alcohol consumption. Thus, the score of five points was warranted.

## D. Resentencing

Because the reduction in score for OV 13 places defendant's sentences for counts I-III above the sentencing guidelines[4] and there is no indication on the record that the trial court would have found a substantial and compelling reason to depart, we must remand this case for resentencing. Cf *People v Mutchie*, 251 Mich App 273, 275; 650 NW2d 733 (2002). Accordingly, we need not decide whether these sentences are proportional.

However, we affirm defendant's sentence for failure to stop at the scene of a serious personal injury accident (count IV). Even with the OV 13 scoring error, his sentence is within the range recommended by the statutory sentencing guidelines. A sentence within the guideline range is presumed proportional and defendant has not presented any circumstances for us to find otherwise. *People v Hogan*, 225 Mich App 431, 437; 571 NW2d 737 (1997).

Defendant also contends that resentencing should take place before a different judge. In determining whether resentencing should occur before a different judge, this Court considers (1) whether the original judge would reasonably be expected upon remand to have substantial

---

[4] Defendant's new sentencing guideline's range is 36 to 71 months' imprisonment, MCL 777.64; thus, his minimum sentence of 84 months' imprisonment for counts I-III is above this range.

difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. *People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997).

Here, defendant cites nothing other than the court's misscoring of the three offense variables at issue in support of his claim. However, the court correctly scored two of these offense variables, and the third involved a question of law. Given these circumstances, we find that defendant has not shown he is entitled to resentencing before a different judge.

Affirmed, but remanded for resentencing. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Michael R. Smolenski
/s/ Patrick M. Meter

# STATE OF MICHIGAN

## IN THE SUPREME COURT

**PEOPLE OF THE STATE OF MICHIGAN**

               Plaintiff-Appellee

-vs-

**PHILLIP CHARLES GIBBS**

               Defendant-Appellant.

_____/

**Supreme Court No.**

**Court of Appeals No.** 306124

**Lower Court No.** 11-28140FC

## NOTICE OF FILING APPLICATION FOR LEAVE TO APPEAL

TO:
**Clerk**
**Genesee County Circuit Court**

**Clerk**
**Court of Appeals**


      PLEASE TAKE NOTICE that the undersigned counsel has filed an APPLICATION FOR LEAVE TO APPEAL in this case.


               Respectfully submitted,

               **STATE APPELLATE DEFENDER OFFICE**

BY: _____

               **RANDY E. DAVIDSON (P30207)**
               **Assistant Defender**
               3300 Penobscot Building
               645 Griswold
               Detroit, Michigan  48226
               (313) 256-9833


Date: April 3, 2013

## STATE OF MICHIGAN

## IN THE SUPREME COURT

**PEOPLE OF THE STATE OF MICHIGAN**

              Plaintiff-Appellee

-vs-

**PHILLIP CHARLES GIBBS**

           Defendant-Appellant.

_____/

**Supreme Court No.**

**Court of Appeals No.** 306124

**Lower Court No.** 11-28140FC

### NOTICE OF HEARING

**TO:**
**GENESEE COUNTY PROSECUTOR**

      PLEASE TAKE NOTICE that on April 30, 2013, the undersigned will move this Honorable Court to grant the within APPLICATION FOR LEAVE TO APPEAL.

                **STATE APPELLATE DEFENDER OFFICE**

**BY:**        _____

                **RANDY E. DAVIDSON (P30207)**
                **Assistant Defender**
                3300 Penobscot Building
                645 Griswold
                Detroit, Michigan  48226
                (313) 256-9833

Date: April 3, 2013

# STATE OF MICHIGAN

## IN THE SUPREME COURT

**PEOPLE OF THE STATE OF MICHIGAN**

                Plaintiff-Appellee

-vs-

**PHILLIP CHARLES GIBBS**

              Defendant-Appellant.

_____/

**Supreme Court No.**

**Court of Appeals No.** 306124

**Lower Court No.** 11-28140FC

## PROOF OF SERVICE

STATE OF MICHIGAN    )
                      ) ss.
COUNTY OF WAYNE     )

      **RANDY E. DAVIDSON**, being first sworn, says that on April 3, 2013, he mailed one copy of Notice of Hearing; Application for Leave to Appeal; Notice of Filing Application for Leave to Appeal; and Proof of Service to:

**GENESEE COUNTY PROSECUTOR**
Courthouse
900 South Saginaw Street
Flint, MI 48502

**CLERK**
Michigan Court of Appeals
Suite 800
201 West Big Beaver
Troy, MI 48084 (Notice of Filing only)

**CLERK**
Genesee County Circuit Court
Room 205 Courthouse
900 South Saginaw Street
Flint, MI 48502 (Notice of Filing only)

_____

**RANDY E. DAVIDSON**

Subscribed and sworn to before me
April 3, 2013.

_____
Joanne M. Moritz
Notary Public, Wayne County, Michigan
My commission expires: 9/2/2019
25680T-J/Randy E. Davidson

# STATE APPELLATE DEFENDER OFFICE

**DAWN VAN HOEK**
DIRECTOR

**JONATHAN SACKS**
DEPUTY DIRECTOR

www.sado.org
Client calls: 313.256.9822



**MAIN OFFICE:**
PENOBSCOT BLDG., STE 3300
645 GRISWOLD
DETROIT, MI 48226-4281
Phone: 313.256.9833 • Fax: 313.965.0372

**LANSING AREA:**
Phone: 517.334.6069 • Fax: 517.334.6987

April 3, 2013

Clerk
Michigan Supreme Court
P. O. Box 30052
Lansing, MI 48909

Re:   <u>People</u> v <u>Phillip Charles Gibbs</u>
Supreme Court No.
Court of Appeals No. 306124
Lower Court No. 11-28140FC

Dear Clerk:

Enclosed please find the original and seven (7) copies of the following: Notice of Hearing; Application for Leave to Appeal; Notice of Filing Application for Leave to Appeal; and Proof of Service for filing in your Court. Also enclosed under MCR 7.212(C)(7) is a copy of the presentence investigation report for confidential review by the Justices.

Thank you for your cooperation.

Yours truly,

Randy E. Davidson
Assistant Defender

RECEIVED
APR 4 2013
CORBIN R. DAVIS
CLERK SUPREME COURT

RED
Enclosures
cc:   Genesee County Prosecutor
      Court of Appeals Clerk (w/ Notice of Filing only)
      Genesee County Circuit Court Clerk (w/ Notice of Filing only)
      Mr. Phillip Charles Gibbs
      File